**Vincent SINAGRA, Plaintiff**

v.

**ATLANTIC OCEAN SHIPPING, LTD. Defendant**

**No. 98 CV 5177.**

United States District Court, E.D. New York.

Sept. 28, 2001.

Martin Lassoff, Esq., New York City, for Plaintiff.

Cornelius A. Mahoney, Esq., Mahoney & Keane, New York City, for Defendant.

*Memorandum and Order*

AZRACK, United States Magistrate Judge.

## I. BACKGROUND

The following facts are either presented in the light most favorable to the plaintiff or are undisputed. On November 27, 1997, the M/V Atlantic Ocean arrived from Ecuador and docked at the Howland Hook Marine Terminal Company's ("Howland") facilities on Staten Island, New York. Howland, a stevedoring entity, was engaged by the Atlantic Ocean to discharge its cargo. The ship's cargo was stored in containers on the deck and crates in the hold. The Atlantic Ocean is owned by defendant Atlantic Ocean Shipping Limited.

Just prior to arriving in port, the Atlantic Ocean's eight man crew began to unlash the containers on its deck and also began to unlock the stacking shoes[1] at-

---

1. A stacking shoe (also commonly referred to as a "twist lock") is a mechanism placed in the four corners of a shipping container. The four stacking shoes per container serve to attach containers together and preclude them from shifting as the vessel travels. Each shoe

tached to the sides of the top tiered containers on its deck. This process was supervised by the ship's Chief Mate, Pavo Herciganja, a graduate of a Croatian nautical college with approximately thirty years of experience at sea. Its purpose was to allow the ship's cargo to be immediately discharged by Howland as soon as the ship docked.

Plaintiff Vincent Sinagra, a thirty-seven year veteran longshore worker, was a member of one of Howland's dock gangs.[2] Sinagra's dock gang, of which he was a member for almost two years, consisted of Angelo Palladino (the hatch boss), Filippo Bongiovanni, Mario Gadaleta and Freddie Rodriguez. Each member of the gang is assigned specific tasks. For example, each would take turns serving as the signal man. This individual would typically be stationed on the deck of a given vessel. He would generally oversee the containers, remove the stacking shoes from each remaining tier of containers, communicate with the crane operator and look out for any pedestrians down below. Typically, the signal man is equipped with a portable radio but this was not always the case. The hatch boss was the only gang member on the dock to have and use a portable radio.

The gang was assigned to a particular hatch of the ship and began its task of discharging containers promptly at 8:00 am. The normal operating procedure was as follows. The containers located on the Atlantic Ocean were lifted off the deck by use of a gantry crane located on the dock.

The gantry crane was owned by Howland and operated by Rodriguez. As each tier of containers was removed, the gang member aboard the ship would remove the stacking shoes located on the tier below. The ship's crew unlocked the shoes placed between the stacked containers and then retrieved the shoes that remained on the tops of the lower containers once the upper containers were lifted by the crane. The containers were then lowered and placed upon a chassis waiting below with the assistance of the remaining gang members who were spread out around the corners of the chassis. Occasionally, a stacking shoe would remain attached to one or more ends of a given container. This situation had to be remedied by the gang as the container could not be placed upon the chassis with a stacking shoe attached.

When a stacking shoe was discovered a member of the gang notified the crane operator, who halted the container and left it suspended so as to allow gang members to reach it just above the chassis. The record reflects, and plaintiff admits, that this was a common occurrence and that the dock workers at Howland routinely removed these shoes by either manually disengaging their twist lock mechanisms, banging them off with a hammer or piece of metal, or torching them off. Once removed, the shoes were discarded or collected in a designated box on the dock. Chief Mate Herciganja monitored, but did not supervise, the stevedoring while he attended to many other matters aboard the ship.

---

has a handle or twist lock that can be pulled in order to release it from its position. These stacking shoes are equipment owned and employed by the vessel.

2. "As a rule the men work in 'gangs' or groups of longshoremen headed by a foreman or 'hatch boss'.... The typical large gang in the New York area consists of nineteen men, allocated as follows: one hatch boss; the winchmen; one signalman or gangwayman; the holdmen (those working in the vessel's hold); and four longshoremen working at the pier or the stringpiece. A gang may work together for years, often at the same pier. Improved pier mechanization and the use of automated and container ships lead to smaller gangs." MARTIN J. NORRIS, THE LAW OF MARITIME PERSONAL INJURIES 9 (4th ed.1990).

At approximately 10:00 am Sinagra was injured during the unloading process. As a container was being lowered from the ship a gang member noticed that it had two stacking shoes attached to it. Palladino and Gadalta, the signal man at the time, brought this to the crane operator's attention who subsequently allowed the container to remain suspended about one foot above the chassis. Bongiovanni and Sinagra were instructed to remove the stacking shoes. Bongiovanni successfully removed the shoe on his end of the container. Sinagra, however, was not as successful. Sinagra first attempted to remove the shoe with his hand. While Sinagra's hand reached to grasp the shoe's handle, the crane suddenly lowered the container causing his right hand to be crushed and the eventual amputation of his index finger.[3] The record does not clearly reflect why the container suddenly lowered. Rodriguez either received a signal from a member of the gang or he independently assumed that the coast was clear and began to lower the container again. A fair review of the record indicates that Rodriguez had either a limited view of the area below or no view at all.[4]

Sinagra brings suit against Atlantic Ocean Shipping Limited claiming negligence on its part. As a result of his injuries plaintiff was out of work for a little over two years. While still a member of his dock gang, plaintiff now performs a lighter work duty and is limited to forty hours of work per week, thereby substantially decreasing his take home pay. Moreover, plaintiff's lessened earnings have caused him marital difficulty. Given the condition of his hand, plaintiff also has difficulty using simple home tools and performing household tasks and is undergoing regular pain treatment. Defendant contends that it owed no duty to plaintiff and that it did not cause any injury to him and moves this Court to grant summary judgment in its favor. For the reasons contained herein, defendant's motion is granted.

---

**3.** The specific stacking shoe involved was never recovered by either party. Nor does the record reveal that it was defective in any way. There is conflicting testimony with respect to the shoe's condition. In his deposition, plaintiff maintains that the stacking shoe was rusted and that is what made it difficult to remove. *Sinagra Deposition*, at 27. The ship's Chief Mate, on the other hand, claims that the stacking shoes were made of galvanized steel and thus incapable of rusting. *Herciganja Deposition*, at 15. In any event, the court deems the condition of the shoe to be irrelevant as it had no bearing on the alleged cause of plaintiff's injuries. *See infra* Part III.B.2.

**4.** The operation of the crane is highly relevant to the negligence inquiry and the deposition testimony of Hatch Boss Palladino is instructive.

Q: Can the crane operator see what's going on after the box is off the ship and more or less over the chassis?
A: He could see to a certain point.
Q: To what extent can the crane operator see?
A: He might not see all the way in the right-hand corner. If he's behind that container the crane operator might not have saw him.
Q: In order for Mr. Sinagra to remove this shoe he would have had to have been at the rear of the container where the doors are?
A: Yes.
Q: He would have had to have been between the ship and the container?
A: Yes.
Q: Do you think the crane operator would have been able to see him in that position?
A: I don't think so. I really can't tell you because I never went up there to see the height.

*Palladino Deposition*, at 17–19; *see also Sinagra Deposition*, at 27 ("Where the shoe was-I never go on top of the crane, but I imagine that in the position where I was and where he was, he couldn't see me well."). There is no testimony that specifically indicates that any gang member gave Rodriguez a signal to lower the container that eventually crushed Sinagra's hand.

## II. Jurisdiction And Applicable Law

At the outset, the Court notes that it is vested with proper subject matter jurisdiction. Article III of the Constitution provides that the "judicial Power shall extend ... to all Cases of admiralty and maritime jurisdiction." *U.S. Const. Art. III § 2.* Pursuant to its Article I power Congress has vested the district courts with original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1) (2000). Accordingly, the federal common law of negligence controls this case as admiralty claims and remedies are involved. *See Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 259, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979).

The Court also notes, and the parties do not dispute, that the Longshore and Harbor Workers' Compensation Act, *as amended,* 33 U.S.C. §§ 901–950 (2000) ("LHWCA" or "Act"), governs the facts of this case. In order to come within the purview of the Act a plaintiff must satisfy its occupational status requirement. It is undisputed that plaintiff is an "employee" under the statutory scheme. *See id.* § 902(3) (defining the term "employee" as "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker"); *see also Triguero v. Consolidated Rail Corp.,* 932 F.2d 95, 99 (2d Cir.1991) (citing *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 267, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977)). Moreover, it is equally undisputed that plaintiff has suffered an "injury" during the course of his employment as defined by the Act. *See id.* §§ 902(2), 902(4). Finally, the M/V Atlantic Ocean is a "vessel" pursuant to the Act. *See id.* § 902(21).

## III. Discussion

### A. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 controls the disposition of summary judgment motions. A court may grant a motion for summary judgment only if the evidence, which is to be viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact. *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996); Fed. R. Civ. P. 56(c). All ambiguities must be resolved in favor of the non-moving party. *Castle Rock Entertainment, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir.1998). The movant bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Adams v. Department of Juvenile Justice,* 143 F.3d 61, 65 (2d Cir. 1998). The burden then shifts to the non-movant who must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec., Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Mere conclusory allegations, speculation or conjecture, however, will not avail a party resisting summary judgment. *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996).

### B. *The Longshore and Harbor Workers' Compensation Act*

■ The LHWCA operates as a comprehensive no-fault workers' compensation scheme for eligible harbor workers. Acting as such, it precludes an employee from seeking relief in tort against his or her employer. *See* 33 U.S.C. § 905(a). The LHWCA, however, does allow an employee to bring suit against negligent third parties.[5] Specifically, section 905(b) allows a

---

5. In this regard, section 933(a) of the Act   provides that if "the person entitled to ...

harbor worker engaged by a vessel to provide stevedoring services to recover from that vessel for any injuries sustained. *Id.* § 905(b). Negligence is the only cause of action allowed by section 905(b) and it is Congress' solution to the "problem[s] inherent in the tripartite relationship among shipowner, stevedore and longshoreman." *Evans v. Tansportacion Maritime Mexicana SS "Campeche"*, 639 F.2d 848, 851 (2d Cir.1981). While Congress is silent as to what conduct or omissions may be deemed negligent, it has "left the determination of shipowner negligence to the 'application of accepted principles of tort law and the ordinary process of litigation'" *Flynn v. American Auto Carriers, Inc.*, 85 F.Supp.2d 158, 163 (E.D.N.Y.2000) (quoting *Scindia*, 451 U.S. at 165, 101 S.Ct. 1614); *accord Lieggi v. Maritime Co. of the Philippines*, 667 F.2d 324, 327 (2d Cir.1981). No cause of action, however, "shall be permitted" where the injury is occasioned "by the negligence of persons engaged in providing stevedoring services to the vessel." 33 U.S.C. § 905(b).[6]

### A VESSEL'S DUTIES OF CARE & SECTION 5(B) OF THE LHWCA

■ In interpreting the LHWCA the Supreme Court has announced that a vessel owes three distinct duties of care to independent contractor stevedores. *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). The legal vernacular has come to term these duties as the "Scindia duties." These three duties include: (1) the "turnover" duty; (2) the "active involvement" duty; and (3) the duty to intervene. *Id.* at 167, 101 S.Ct. 1614. They are discussed *seriatim*.

### 1. The Atlantic Ocean's Turnover Duty

■ The turnover duty confines itself to the condition of the vessel at the time the stevedore embarks upon its operations and consists of two components. To begin with, the vessel is expected to exercise ordinary care in surrendering "its equipment and appliances 'in such a condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property." *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994) (quoting *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416–17 n. 18, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969)). As *Scindia* makes clear, the gravamen of a vessel's duty is to provide the stevedore with a work area within which it can safely operate and avoid exposure to "unreasonable hazards." *Scindia*, 451 U.S. at 170, 101 S.Ct. 1614. There is no duty to turn over an absolutely safe vessel.

■ With respect to the second component, a vessel cannot fail to warn the stevedore of any known but hidden dangers on the ship or its equipment that are discoverable by employment of reasonable care, *Scindia*, 451 U.S. at 167, 101 S.Ct. 1614, and "would likely be encountered by the stevedore . . . and would not be obvi-

---

compensation determines that some person other than the employer ... is liable for damages, he need not elect whether to receive such compensation or to recover damages against such third person." *Id.* § 933(a).

**6.** The LHWCA is accompanied by a critical legislative history that will not be delved into

here but is exhaustively discussed elsewhere. *See* H.R.Rep. No. 570(I), *reprinted in* 1984 U.S.C.C.A.N. 2734; H.R.Rep. No. 92–1441, *reprinted in* 1972 U.S.C.C.A.N. 4698; *see also Howlett*, 512 U.S. at 96–98, 114 S.Ct. 2057 (discussing the 1972 amendments).

ous to or anticipated by him if reasonably competent in his work." *Howlett*, 512 U.S. at 98–99, 114 S.Ct. 2057. The stevedore is primarily chargeable with avoiding all obvious hazards. *Scindia*, 451 U.S. at 180, 101 S.Ct. 1614 (Powell, J., concurring). In sum, where a danger is both obvious and avoidable a vessel cannot be charged with negligence.[7]

■ The evidence viewed in the light most favorable to Sinagra compels the conclusion that the Atlantic did not breach its turnover duty. First, there is no evidence that the stacking shoe that Sinagra attempted to remove was defective in any way. Moreover, stacking shoes are pieces of the ship's equipment that a longshoreman can reasonably expect to, and in fact frequently do, encounter. In fact, as the members of the Palladino gang have testified, they regularly encounter them and remove them in a prescribed manner. *See Howlett*, 512 U.S. at 98–99, 114 S.Ct. 2057.

Stacking shoes, furthermore, are neither hidden or hazardous. While the Supreme Court is ambivalent on the issue, *Howlett*, 512 U.S. at 100, 114 S.Ct. 2057; *Scindia*, 451 U.S. at 168 n. 14, 101 S.Ct. 1614, the Second Circuit adopts the Restatement of Torts as its guide to negligence under section 905(b). *See, e.g., Evans*, 639 F.2d at 852–53, 855. Section 343A of the Restatement (Second) of Torts provides: "A possessor of land is not liable to his invitees for physical harm to them by any

activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate that harm despite such knowledge or obviousness." In this regard, the Court is mindful of the proposition that whether something is open and obvious is more than likely a question of fact. *Kirsch v. Plovidba*, 971 F.2d 1026, 1030 (3d Cir.1992) (Becker, J.). The facts herein, however, make clear that this is not case here. *See, e.g., Affidavit of Sinagra*, at 2 (admitting that "when I saw the container [it] was coming down with a container shoe attached to it ..."). Hence, the moment the gantry crane lifted the container the shoe became open and obvious to Sinagra, Bongiovanni, and the signal man. Additionally, longshoreman are fully cognizant of the fact that stacking shoes are customarily used to bind containers together and they readily anticipate them sticking to the sides of containers. Finally, because any conceivable danger became obvious to both the gang and the ship at the same time, "there was no warning that the ship could have given that would have added to the knowledge of a competent stevedore." *Derr v. Kawasaki Kisen*, 835 F.2d 490, 496 (3d Cir.1987).

Assuming for the moment that the shoe was a hazard or in a hazardous condition, liability would still not attach to the vessel. The vessel's duty to eliminate obvious hazards is triggered "only when it should have

---

7. The Court notes that the turnover duty is of a somewhat relative nature. Under present law, in effect, a vessel owes less of a duty to the stevedore the more obvious a dangerous condition appears to be. The degree of obviousness serves to dictate whether the vessel owes a duty in the first place and hence whether plaintiff can even survive a motion to dismiss against a ship. A plaintiff's reaction to a perfectly obvious and dangerous condition is not taken into account at all; that is, his conduct does not serve to offset any recovery as it would under a typical comparative

negligence scheme. As such the law in its operation mimics the ancient contributory negligence and assumption of the risk tort doctrines. *Kirsch*, 971 F.2d at 1031 n. 6. "At a practical level, the result is easier to accept when one recognizes that we deal here with a liability triangle that also includes the stevedore, upon whose expertise in cargo operations, the Supreme Court has emphasized, the shipowner may ordinarily rely. The longshore worker is not left without a remedy, for he or she maintains a statutory right to compensation from the stevedore." *Id.*

expected that an expert stevedore could not or would not avoid the hazard and conduct cargo operations reasonably safely." *Kirsch*, 971 F.2d at 1031. On these facts there is no basis to conclude that the longshoremen could not ameliorate any danger posed. Indeed, the very fact that the discharging of cargo is carried out by "expert and experienced stevedore[s] 'implies that certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore could safely work around them.'" *Id.* at 1030–31 (*quoting Bjaranson v. Botelho Shipping Corp., Manila,* 873 F.2d 1204, 1208 (9th Cir.1989)). The gang was in the best position to avoid and counteract any risk presented. Had it followed appropriate safety procedures it could have removed the shoe with ease as it had on countless occasions prior. Moreover, the injury to Sinagra was not occasioned by the shoe itself; rather it was brought about by the fact that his fellow Howland employee lowered the container without notice and without regard to Sinagra. *See infra* Part III.B.2. In fact, after Sinagra's injury the shoe was immediately removed without incident. In light of the fact that plaintiff has failed to demonstrate any evidence suggesting a breach of the Atlantic's turnover duty, a grant of summary judgment on this issue is appropriate.

### 2. Active Control

■ Where stevedoring operations have commenced, a vessel may be held liable if it negligently causes injury by actively involving itself in such operations, *Scindia,* 451 U.S. at 167, 101 S.Ct. 1614, or negligently injures a longshoreman in an area that remains in its active control. *Howlett,* 512 U.S. at 98, 114 S.Ct. 2057. According to the Second Circuit:

> A passive vessel owner has no ongoing duty to supervise or inspect the stevedore's work-absent contractual, regulatory or customary obligations to the con-

trary. However, even where the vessel does not actively involve itself in the stevedoring operations, it may be liable 'if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.' *Gravatt v. City of New York,* 226 F.3d 108, 121 (2d Cir.2000) (quoting *Scindia,* 451 U.S. at 167, 101 S.Ct. 1614).

Active involvement in and of itself does not automatically translate into liability; the active involvement must constitute negligent behavior. *See* 33 U.S.C. § 905(b).

■ Plaintiff has failed to demonstrate that the crew of the Atlantic Ocean negligently and actively involved itself in the discharge of its cargo or exposed him to a hazzard stemming from the ship's equipment. Plaintiff places great emphasis on the fact that the crew of the ship unlashed the containers and unlocked the stacking shoes attached to the first tier of containers. *See Plaintiff's Memorandum of Law,* at 3–7. Plaintiff's emphasis on this undisputed fact is misplaced. The active involvement that *Scindia* envisions has to do with the discharging of cargo and not occurrences prior to the ship even docking. The *Scindia* duties operate in a temporal and sequential fashion. At the time of said conduct, defendants had not even implicated their turnover duty yet, let alone had a chance to take active control. The crew was merely preparing to turn over the ship and allow for the expeditious discharge of its cargo. Plaintiff begins his memorandum by candidly admitting this. *See Plaintiff's Memorandum of Law,* at 3 (stating that the "releasing of said container shoes and container shoe locks on the vessel itself prior to any longshoreman having anything to do with the container ...").

The fact that the ship's crew was involved in repeatedly unlocking the stacking shoes on each subsequent tier of containers is somewhat problematic with respect to a grant of summary judgment on active control. Whether this would constitute active involvement is possibly a jury question. The Court is unprepared to hold that such conduct is not active control as a matter of law.[8] However, this issue of fact is not fatal to defendant's motion as plaintiff has not demonstrated that defendant proximately caused his injury.

The garden variety elements of negligence include proof that (1) the defendant owes plaintiff a duty of reasonable care; (2) the duty owed was breached; (3) the breach of that duty caused plaintiff's injury; and (4) the plaintiff has suffered cognizable damages stemming therefrom. *Trueba v. Flota Bananera Ecuadorian Lines, Inc.*, 675 F.Supp. 786, 788 (S.D.N.Y. 1987). A defendant is deemed the proximate cause of all harmful results (and thus liable) that are the normal incidents of and within the increased risk caused by his acts. It must be more likely than not that his conduct was a substantial factor in occasioning the harm. *See* W. PAGE KEETON, ET AL., PROSSER AND KEETON ON TORTS 263–68 (5th ed.1984).

■ Assuming that the Atlantic was in active control and breached its duty of due care with respect to Sinagra, the causation element of negligence has not been satisfied. There is no evidence that the Atlantic's crew was negligent. *See Landon v. Lief Hoegh & Co., Inc.*, 521 F.2d 756, 763 (2d Cir.1975). Here, the crane that was used to discharge the cargo was owned and operated by plaintiff's employer Howland. It was plaintiff's fellow dock gang member Rodriguez that lowered the container that crushed plaintiff's finger. Rodriguez either received a signal to lower the crane (although there is no evidence of this) or just independently assumed that the coast was clear, the latter being more likely than not. *See, e.g., Sinagra Deposition*, at 32 ("Because if there-if there's a long time, the guy who's operating the crane can say, oh, he's removed it. Especially in the position I was in."). There was nothing unusual or uncustomary that occurred on the day of Sinagra's accident. *See Lubrano v. Companhia De Navegacao Lloyd Brasileiro*, 575 F.Supp. 1541, 1545 (S.D.N.Y.1983). Moreover, no member of the ship's crew gave any direction to or even communicated with Rodriguez. It was the sole negligence of Howland and the Palladino gang that lead to plaintiff's injury. *See Scindia*, 451 U.S. at 179 n. 26, 101 S.Ct. 1614; *Landon*, 521 F.2d at 763.

The record provides ample proof that the removal of shoes and the suspension of containers went on as usual. *See id.* The record further reflects that Howland did not have a systematic procedure allowing its employees to communicate effectively with one another. The deposition transcripts are replete with instances evincing a completely ad hoc operation on Howland's part when it comes to the safety of its employees. Any dangerous condition herein was brought about by the stevedore and not by Atlantic. "Congress intended to make the vessel answerable for its own negligence and to terminate its automatic, faultless responsibility for conditions caused by the negligence or other defaults

---

**8.** While both the ship and stevedore can be deemed concurrently negligent, *Edmonds*, 443 U.S. at 260, 99 S.Ct. 2753; *Tragni v. Establissement Maritime Camille*, 705 F.2d 92, 93 (2d Cir.1983), it must be emphasized that such an inquiry is separate and apart from the threshold issue of active control. It bears equal emphasis that where the negligence of the stevedore is the only negligence, a ship cannot be fastened with liability. *Landon*, 521 F.2d at 763.

of the stevedore." *Scindia*, 451 U.S. at 168, 101 S.Ct. 1614. Accordingly, summary judgment in favor of defendant is appropriate with respect to active control.

### 3. Intervention

■■■■■■ Broadly speaking, a vessel has no duty to inspect or supervise discharging operations so as to discover any developing dangerous conditions that may exist in the area in which the stevedore is operating. *Scindia*, 451 U.S. at 172, 101 S.Ct. 1614. This intervention duty, which may be altered by contract, positive law or custom to the contrary, is implicated upon the satisfaction of the turnover duty and when the stevedore commences its operations. *Id.* It "concerns the vessel's obligations with regard to cargo preparations in areas under the principal control of the independent stevedore." *Howlett*, 512 U.S. at 98, 114 S.Ct. 2057 (citation omitted). A shipowner may rely on an independent stevedore to tend to the safety of its own employees and to perform its task ably. *Scindia*, 451 U.S. at 171–72, 101 S.Ct. 1614. For example, where a dangerous condition manifests itself after stevedoring has commenced a vessel may safely rely on the stevedore to counteract it and protect its employees.[9] Where a patent danger develops in such an area, however, "the vessel owner must intervene if it acquires actual knowledge that (1) a condition of the vessel or its equipment poses an *unreasonable risk* of harm and (2) the stevedore is not exercising reasonable care to protect its employees from that risk." *Gravatt*,

226 F.3d at 121 (citing *Scindia*, 451 U.S. at 175–76, 101 S.Ct. 1614) (emphasis supplied); *see also Bradford v. The Barge B–10*, No. 98 CIV 2991, 1999 WL 1256248 *3 (S.D.N.Y. Dec. 27, 1999); *Cartelli v. Egyptian Navigation Co. Inc.*, 661 F.Supp. 104, 106 (S.D.N.Y.1986). Even where a dangerous condition is open and obvious, an informed shipowner must intervene to curtail the "obviously improvident" acts or omissions of the stevedore. *Scindia*, 451 U.S. at 175, 101 S.Ct. 1614.

It was the intervention duty that was at issue in *Scindia*. There, a stevedore was employed to load sacks of wheat into the hold of a ship. To accomplish its task the stevedore was using the ship's winch, which was found to be in a defective condition and allegedly malfunctioning two days prior. As a result, sacks of wheat were caused to fall and eventually injure a longshoreman. In reversing a grant of summary judgment the Supreme Court ruled that a question of fact existed as to whether the ship should have realized that the winch created an unreasonable risk of harm. If so, the ship would then have had to intervene and repair it. The ship's duty with respect to its equipment and workspace, the Court went on to conclude, exists in terms of warning about "hidden dangers" that a stevedore could not realize. The present controversy is in no way similar to the facts of *Scindia*.

■■■■■ Plaintiff has not sustained its burden of illustrating sufficient facts warranting trial on this score. *See, e.g., Matsushi-*

---

9. Section 941 of the LHWCA charges the stevedore with furnishing a "reasonably safe place to work." Section 941 mandates that all employers "furnish and maintain employment and places of employment which shall be reasonably safe for his employees in all employments ... and shall install, furnish, maintain, and use such devices and safeguards with particular reference to equipment used by and working conditions established

by such employers as the Secretary [of Labor] may determine by regulation or order to be reasonably necessary to protect the life, health, and safety of such employees, and to render safe such employment and places of employment, and to prevent injury to his employees." *Id.* The Labor Department's longshoring safety and health regulations are set out in 29 C.F.R. §§ 1918.1—1918.42 (2001).

*ta*, 475 U.S. at 586–87, 106 S.Ct. 1348. First, and as previously noted, there is no evidence upon which the Court could even infer that the stacking shoe itself was a hazzard. Moreover, there is no evidence to attribute actual or even constructive knowledge on Atlantic's part of a danger posed by the shoe to the Howland gang. Furthermore, plaintiff has not even come close to showing that Howland was not acting to protect its employees from any danger posed by the shoes. *See Tragni v. Establissement Maritime Camille*, 705 F.2d 92, 93 (2d Cir.1983) (*citing Lieggi*, 667 F.2d at 328). "The stevedore is specifically hired for its expertise in coping with the dangers inherent in loading and unloading cargo, and in many cases it will be perfectly reasonable for the shipowner to assume that the stevedore will correct the defect." *Scindia*, 451 U.S. at 176, 101 S.Ct. 1614. While a ship may not supinely rely on the stevedore at all times, there is nothing presented here to alter the assumption of general reliance by the ship.

Additionally, there is nothing in this record to indicate that the stevedore was acting in an improvident manner. As noted, the removal of stacking shoes by gang members was a common occurrence and part of the gang's work duty. The stacking shoes were frequently removed by the gang by banging them off with a hammer or torching them off or simply unlocking its handle. In fact, so frequent was the occurrence that Howland even had a box on the dock so as to collect the discarded shoes. In sum, the Atlantic had no duty to intervene and thus summary judgment on this issue is appropriate as well.

IV. CONCLUSION

For the reasons set forth, defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is granted in its entirety.

IT IS SO ORDERED.