TRAGER, District Judge.
 

 Plaintiff Jesus Fernandez (“Fernandez”) and his wife, Candida Fernandez,
 
 [1]
 
 initiated this action against defendants China Ocean Shipping, (Group) Company, and Guangzhou Shipping Company (collectively, the “defendants”). This action arises out of injuries suffered by Fernandez while working as a longshoreman unloading cargo aboard the vessel M/V LE SHENG (the “LE SHENG”). Fernandez claims that his injuries were caused by defendants’ negligence and that defendants are liable for damages pursuant to the Long-shore and Harbor Workers’ Compensation Act, 33 U.S.C. § 905(b). Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.
 

 Background
 

 The following facts are either undisputed by the parties or presented in the light most favorable to plaintiff. Defendants are the owners of the LE SHENG, a general cargo vessel built in 1998 for the purposes of transporting breakbulk (i.e., non-containerized) cargo. (Defendants’ Rule 56.1 Statement (“Defs.’ St.”) ¶ 2.) The vessel contained four cargo holds (or hatches), with each hatch containing two levels- — -a tweendeck (upper cargo storage area) and a lower hold. Above the tween-deck is the vessel’s main deck (the deck exposed to the sky).
 
 (Id.
 
 ¶2.) To discharge the cargo in a particular hatch, part of the floor of the main deck above is opened, exposing the center (the square) of the hatch. After removing the cargo that is in the square of the hatch, the longshoreman move the cargo that is stowed in the sides (the wings) toward the open square where it can be unloaded by the crane.
 

 Attached to the fore and aft walls of each hold is a ladder leading up from the tweendeck to the main deck.
 
 (Id.
 
 ¶ 4.) About one meter to the left or the right of the tweendeck ladder, in the floor of the tweendeck, is an access door (or escape hatch).
 
 (Id.)
 
 The access door cover can be lifted up by hand and opens toward the wall where it can be fastened to the wall to keep the access door open.
 
 (Id.)
 
 Beneath the access door is another ladder leading down to the lower hold.
 
 (Id.
 
 ¶ 5.) The floor around the access doors was marked with black and orange stripes.
 
 (Id.)
 
 This arrangement of the access doors and ladders is common in general cargo ships.
 
 (Id.
 
 ¶ 6.)
 

 In November and December 1999, the LE SHENG loaded cocoa bean cargo in Abidjan.
 
 (Id.
 
 ¶ 7.) The loading was performed by a stevedoring company in Abidjan; the vessel’s crew did not participate in the loading at Abidjan.
 
 (Id.
 
 ¶ 8-9.) To prevent the cocoa bean cargo from becoming wet — which can ruin the cargo — -the load port stevedore covered the cocoa bean cargo with a thick brown paper known as kraft paper.
 
 (Id.
 
 ¶ 13.) The kraft paper was placed along the walls and under the cargo. (Azzarelli Aff. ¶ 7) The cargo was also stowed with dunnage (wood planks) placed under and between the cargo. (Defs.’ St. ¶ 14.) The use of dunnage and kraft paper is the customary practice of the maritime transport of cocoa beans.
 
 (Id.
 
 ¶ 13.)
 

 When the cargo is unloaded at the discharging port, the dunnage and kraft pa
 
 *CDXIV
 
 per are pushed to the sides of the hatch or fall away from the cargo as it is unloaded.
 
 (Id.
 
 ¶ 36-37; Azzarelli Aff. ¶¶ 7-8.) The debris must later be cleared from the hold. (Defs.’ St. ¶¶ 12, 37.) Defendants acknowledge that, except during the time when stevedoring operations were ongoing, it was the crew’s duty to keep the area around the access door and the ladders free of debris.
 
 (Id.)
 
 However, during ste-vedoring operations, it was the stevedore that controlled that area, and the crew was not responsible for clearing the debris from the access door area.
 
 (Id.
 
 ¶ 37; PI. St. ¶37.)
 

 Both at port and during the voyage, the vessel’s chief officer, Jianli Shen (“Shen”), monitored the condition of the stow by descending to the lower hold at least twice daily. (Defs.’ St. ¶ 21.) Shen testified that he would always leave open the access door between the tweendeck and the lower hold.
 
 (Id.
 
 ¶ 21.) He did so to ventilate the lower hold which did not have a mechanical ventilation system.
 
 (Id.
 
 ¶ 21; Shen Deck ¶¶ 6-7.) However, the vessel’s captain, Ming Chen (“Chen”) testified that the access doors were always kept closed because of the danger that someone might fall through them. (Chen Dep. 56-57.)
 

 The vessel arrived in Brooklyn, New York, in December 1999 and the discharging of the cargo commenced on Friday, December 7, 1999 and continued through December 18, 1999. (Platek Aff., Ex. 11.) The unloading was performed by a steve-doring company, American Stevedoring, Inc. (“ASI”). (Defs.’ St. ¶23.) Defendants claim that before steverdoring operations began, Shen met with the stevedor-ing superintendent of ASI to discuss the discharge plan as well as the layout of the LE SHENG. (Shen Dep., at 17-18, 56-57.) Defendants also claim that Shen pointed out the access doors and the fact that all of the hatches were open. (Shen Dep., at 56-57.) Defendants’ have also submitted an affidavit from Joseph Azza-relli (“Azzarelli”), who was the hatch foreman and claims to have warned his longshoremen-at least on December 7, 2003— to mind the open access the doors.
 
 (Id.
 
 ¶ 34.)
 

 On December 7, 1999, Fernandez worked as a longshoreman aboard the LE SHENG without incident. (PI. St. ¶ 38; Platek Reply Aff., Ex. 19.) Some discharging operations took place between during December 8 and December 10, 1999, but Fernandez did not participate in them. (Platek Reply Aff., Ex. 19.) No discharging operations occurred during the weekend of December 11-12, 1999. (Pla-tek Aff., Ex. 11.)
 

 At the time, Fernandez was a veteran longshoreman with 36 years of experience in loading and unloading vessels. (Pl.St. ¶ 38.) Fernandez was not a member of the LE SHENG’s crew; nor was he supervised directly by them. On December 13, 1999, Fernandez was assigned to a gang that was unloading hatch number 1. (Fernandez Dep., at 31.) Fernandez did not work in hatch number 1 before December 13, 1999. (Id.) However, an earlier gang of longshoremen had begun discharging hatch number 1 as early as December 8, 1999. (Platek Aff., Ex. 11.)
 

 After working through the morning in hatch number 1, Fernandez left for a lunch break and headed to the ladder leading up to the main deck. (Buzzetta Dep., at 22-23; Fernandez Dep., at 36-38.) Fernandez stood atop a layer of cargo that was lined up against the ladder leading up to the main deck; he reached out to the ladder and stepped forward onto the open access door. (Buzzetta Dep., at 22-23; Fernandez Dep., at 45-46.) Fernandez dropped through the debris covering the open access door and fell several feet down
 
 *CDXV
 
 into the lower hold.
 
 [2]
 
 (Buzzetta Dep., at 22-23; Fernandez Dep., at 45-46.) Fernandez injured himself and claims to still be suffering from back and leg pain. (Fernandez Dep., at 70-72.)
 

 Defendants claim, based on Shen’s testimony, that on each day after the longshoremen left, the crew cleaned up the dunnage and kraft paper that remained. (Defs.’ St. ¶ 42; Shen Dep., at 62-63.) Additionally, Shen testified that on the days leading up to December 13, he inspected all the hatches and did not find any dun-nage or loose debris. (Defs.’ St. ¶¶ 44-45.) Defendants claim that, consequently, any kraft paper or dunnage that may have concealed the open access door on December 13 was placed there after the crew turned over the hatch to the stevedore. Indeed, for what its worth, Azzarelli avers that his “experience with Chinese ships’ crews is that they are very good about cleaning up the paper and dunnage when the longshoremen break for the day. They even sweep up.” (Azzarelli Aff. ¶ 8.)
 

 Plaintiff relies on Buzzetta, one of Fernandez’s co-workers, who described the LE SHENG as “dirty ... a lot of rust [and] not well maintained.” (Buzzetta Dep., at 28.) However, plaintiff does not have any witnesses or evidence that the access door was obstructed on the morning of December 13 when the crew turned over the vessel for discharging. Nor did plaintiff submit any evidence or testimony challenging the veracity of Shen’s testimony that the debris was removed every day after the longshoremen left.
 

 Discussion
 

 Summary judgment is granted when “there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c). On a motion for summary judgment, the court must consider “whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In making this determination, all factual inferences must be drawn in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion.
 
 See id.
 
 at 255, 106 S.Ct. at 2513;
 
 Celotex Corp. v. Catrett, 477
 
 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). “To defeat a motion for summary judgment in an ordinary civil case, a plaintiff must present evidence based on which ‘reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.’ ”
 
 Prunier v. City of Watertown,
 
 936 F.2d 677, 679 (2d Cir.1991) (quoting
 
 Anderson, 477
 
 U.S. at 252, 106 S.Ct. at 2512). However, “conclu-sory statements, conjecture, or speculation” by the non-moving party will not
 
 *CDXVI
 
 defeat the motion.
 
 Kulak v. City of New York,
 
 88 F.3d 63, 71 (2d Cir.1996).
 

 (1)
 

 Longshore and Harbor Workers’ Compensation Act
 

 “The shipowner, longshoreman and stevedore form a tripartite legal triangle that is governed by the Longshore and Harbor Workers’ Compensation Act (the “LHWCA”), as amended in 1972, 33 U.S.C. § 905(b).”
 
 Conenna v. Loyal Chartering Corp.,
 
 2003 WL 255947, at *4 (E.D.N.Y. Feb. 5, 2003) (Trager, J.).
 
 [3]
 
 “The LHWCA ‘establishes a comprehensive federal workers’ compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death.”
 
 O’Hara v. Weeks Marine, Inc.,
 
 294 F.3d 55, 62 (2d Cir.2002) (quoting
 
 Howlett v. Birkdale Shipping Co.,
 
 512 U.S. 92, 96, 114 S.Ct. 2057, 2062, 129 L.Ed.2d 78 (1994)). Under this no-fault workers’ compensation scheme, an injured longshoreman is entitled to these benefits regardless of fault.
 
 See id.
 
 “The injured longshoreman’s employer — in most instances, an independent stevedore — must pay the statutory benefits regardless of fault, but is shielded from any further liability to the longshoreman.”
 
 Howlett,
 
 512 U.S. at 96, 114 S.Ct. at 2062 (citation omitted). The longshoreman receiving compensation under the LHWCA cannot sue the employer for negligence.
 
 See id.
 

 However, the LHWCA allows an injured longshoreman to bring a negligence action against a third party — who, in longshoreman injury cases, is often the vessel owner.
 
 See O’Hara,
 
 294 F.3d at 62. Indeed, § 905(b) of the LHWCA specifically contemplates such lawsuits stating that “[i]n the event of injury to a person covered under this Act caused by the negligence of a vessel ... such person ... may bring an action against such vessel as a third party.” 33 U.S.C. § 905(b). However, the LHWCA limits the liability of the vessel to negligence claims and disallows the broader “warranty of seaworthiness” as a legal basis for vessel liability.
 
 Id.
 

 The LHWCA does not define what constitutes “negligence of a vessel,” except to say that the stevedore’s negligence cannot be the basis for the vessel’s liability.
 
 Id.
 
 “Instead, Congress left the determination of negligence to the ‘application of accepted principles of tort law and the ordinary process of litigation.’ ”
 
 Esposito v. Maritrans Operating Partners, L.P.,
 
 1995 WL 708693 at *3 (S.D.N.Y. Dec. 1, 1995) (quoting
 
 Scindia Steam Navigation Co. v. De Los Santos,
 
 451 U.S. 156, 166, 101 S.Ct. 1614, 1621, 68 L.Ed.2d 1 (1981)).
 

 In defining “negligence,” the Supreme Court has referred to the congressional intent of the 1972 amendments to the LHWCA in establishing the duties of care owed by a vessel' — the breach of which would constitute negligence. The Supreme Court found that the purpose of the 1972 amendments to the LHWCA was to “shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer.”
 
 Howlett,
 
 512 U.S. at 97, 114 S.Ct. at 2063. As such, the Court held that vessels should not be subjected to lawsuits “for injuries that could be so anticipated and prevented by a competent stevedore.”
 
 Id.
 

 
 *CDXVII
 
 The Supreme Court in two cases,
 
 Scin-dia
 
 and later in
 
 Hoivlett
 
 — both involving injured longshoremen suing the vessel owners — has articulated three duties of care owed by vessel owners to longshoremen.
 
 See Howlett,
 
 512 U.S. at 98, 114 S.Ct. at 2063;
 
 Scindia Steam Navigation Co. v. De Los Santos,
 
 451 U.S. 156, 172-73, 101 S.Ct. 1614, 1624-25, 68 L.Ed.2d 1 (1981). These three duties “define[ ] the scope of the vessel’s duty of care in the classic tripartite situation under § 905(b).”
 
 Gravatt v. City of New York,
 
 226 F.3d 108, 120 (2d Cir.2000). Known as the
 
 Scindia duties,
 
 they impose upon the vessel the following duties: the turnover duty; the active control duty; and the duty to intervene.
 
 See id.
 
 at 120-21.
 

 a. The Turnover Duty
 

 The
 
 turnover duty
 
 imposes upon the vessel owner a duty to exercise “ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety.”
 
 See id.
 
 (quoting
 
 Scindia,
 
 451 U.S. at 167, 101 S.Ct. at 1622). The turnover duty also encompasses a “duty to warn” of latent hazards: the vessel owner must “warn the stevedore of hidden dangers that could not be discovered through the exercise of reasonable care.”
 
 See id.
 
 at 121.
 

 “There is no duty to turn over an absolutely safe vessel.”
 
 Sinagra v. Atl. Ocean Shipping,
 
 182 F.Supp.2d 294, 300 (E.D.N.Y.2001). Moreover, “certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore could safely work around them.”
 
 Id.
 
 at 302 (citations and quotations omitted). Accordingly, routine and obvious conditions that arise during stevedoring operations do not implicate a turnover duty even when they arise before the stevedore commences operations.
 

 In
 
 Hoivlett,
 
 a longshoreman slipped and fell on a sheet of clear plastic that was improperly placed by the load port stevedore underneath the cargo of cocoa beans.
 
 See Howlett,
 
 512 U.S. at 94-95, 114 S.Ct. at 2061. The longshoreman claimed that when the cargo was removed, exposing the surface, he slipped on the plastic that was obscured by debris.
 
 See id.
 
 The vessel crew had supplied the plastic to the load port stevedore and the longshoreman claimed that the vessel had knowledge of the hazard and, as such, had a duty to warn the stevedore and longshoremen of the hazard.
 
 See id.
 

 The Court held in
 
 Howlett
 
 that the turnover duty as it applies to the condition of the cargo is a narrow one.
 
 See id.
 
 at 105, 114 S.Ct. at 2067. It does not apply to obvious conditions.
 
 See id.
 
 The vessel owner is not obligated to inspect the ship and cargo before turning over the ship to the stevedore for cargo operations because any defect obvious enough for the vessel owner to detect would be discovered by a competent stevedore.
 
 See id.
 
 Moreover, the vessel owner is “entitled to assume that a competent stevedore will be able to identify and cope with defects in the stow.”
 
 See id.
 
 at 105, 114 S.Ct. at 2067.
 

 Applying these principles to the facts in
 
 Howlett,
 
 the Court remanded the case for further factual determinations.
 
 See id.
 
 at 105-06, 114 S.Ct. at 2067. The Court found that knowledge of the condition by some crew members could be imputed to the ship owner since they supplied the plastic.
 
 See id.
 
 Furthermore, it held that the district court erred in assuming that if the condition was observed by the crew members, it was not a latent condition and therefore observable to a competent stevedore.
 
 See id.
 
 The Court explained that
 
 *CDXVIII
 
 what may have been an open and obvious condition during loading could have become a latent condition at the discharging port.
 
 See id.
 
 The Court then held that summary judgment for defendant would be appropriate if the district court found that the plastic was visible when the longshoreman slipped on it.
 
 See id.
 

 b. The Active Control Duty
 

 Under the
 
 active control duty,
 
 “once stevedoring operations have begun, the vessel will be liable ‘if it
 
 actively involves
 
 itself in the cargo operations and negligently injures a longshoreman.’ ”
 
 Gravatt,
 
 226 F.3d at 121 (2d Cir.2000) (quoting
 
 Scindia,
 
 451 U.S. at 167, 101 S.Ct. at 1614). The vessel owner that is not involved in cargo operations “has no ongoing duty to supervise or inspect the stevedore’s work — absent contractual, regulatory or customary obligations to the contrary.”
 
 Id.
 
 However, the vessel owner is still liable for unreasonable hazards in areas that remain under the vessel’s control during cargo operations.
 
 See id.
 

 c. The Duty to Intervene
 

 As stated above, the vessel owner generally has no duty to warn the stevedore of obvious defects and may rely on the stevedore’s expertise during cargo operations. However, the courts have carved out a
 
 duty to intervene
 
 where the vessel owner is aware of a dangerous condition and the stevedore is not exercising reasonable care to protect the employees.
 
 See id.
 
 (citing
 
 Scindia,
 
 451 U.S. at 175-76, 101 S.Ct. at 1626). A stevedore’s judgment may be so “obviously improvident” that a vessel owner that is aware of the stevedore’s inability or unwillingness to correct a dangerous condition must intervene.
 
 Scindia,
 
 451 U.S. at 175-76, 101 S.Ct. at 1626. “Under such circumstances, the vessel owner may have a duty to intervene and repair the condition regardless of the fact it is open and obvious.”
 
 Bradford v. BARGE B-10,
 
 1999 WL 1256248 (S.D.N.Y. Dec. 27, 1999);
 
 see Lieggi v. Maritime Co.,
 
 667 F.2d 324, 328 (2d Cir.1981).
 

 (2)
 

 Defendants’ Motion for Summary Judgment
 

 To successfully defend this motion for summary judgment, plaintiff must show that there is a genuine issue of material fact as to whether defendants breached one or more of the
 
 Scindia
 
 duties. As for the second duty- — the active control duty— although the crew was responsible for clearing the area after the longshoremen left, it is clear that the crew ceded control of the access door area to the stevedore during the discharging of the cargo. Accordingly, there is no genuine issue of material fact as to that duty. As for the third duty — the duty to intervene — there is no evidence that the stevedore’s actions were so “obviously improvident” as to implicate the duty to intervene. Hence, only the first prong of the
 
 Scindia
 
 duties — the turnover duty — is worthy of analysis in this case.
 

 Defendants move for summary judgment arguing that there are no genuine issues of material fact in this case because the open access door was an obvious hazard and that any debris covering the open door was placed there by the longshoremen on December 13, 1999. Defendants point to the affidavit and testimony by Shen that the area around the access door was free of debris when the longshoremen began working on December 13, and that any prior debris had been removed. Defendants concede that the access doors were open. They rely, however, on
 
 Row-lett
 
 and
 
 Scindia
 
 for the proposition that if the hazard is obvious, then it is the steve
 
 *CDXIX
 
 dore’s duty — not the vessel’s — to correct or work around the hazard.
 

 Plaintiff, on the other hand, claims that the open access door was a latent hazard because it was covered by debris that existed from discharging operations performed previously — which was not removed by the crew, as required. The parties have also wasted quite a bit of ink debating the level of the crew’s experience in the transport of cocoa bean cargo, whether keeping the access doors open was the proper procedure and whether the ventilation system was such that required open access doors. However, at the end of the day, the critical question is not whether the access doors were appropriately open for the benefit of the cargo, or, for that matter, whether an unconcealed open access door is a hazard. Even if an open access door can be considered a hazard, it must be a concealed hazard for vessel liability to arise under the LHWCA.
 
 [4]
 

 Both sides refer to cases involving longshoremen slipping on oil patches, and, indeed, those cases are analogous. An oil patch can create a hazard, but, nonetheless, “if ... we could assume that the oil slick were obvious to a reasonably prudent stevedore and its longshore workers but small enough to be avoided easily by skirting it, we could conclude that the stevedor-ing operations could be concluded safely, and hence that the shipowner was not negligent in failing to provide a safe workplace.”
 
 Kirsch v. Plovidba,
 
 971 F.2d 1026, 1030 (3d Cir.1992) (finding no vessel liability because oil patch was an open hazard). However, where a vessel contains an oil slick that is obscured in some way it may constitute a failure of the turnover duty.
 
 See Intaglio v. Wallenius Lines (Japan) Ltd.,
 
 1998 WL 6785132, at *2 (E.D.N.Y. May 22, 1998) (denying summary judgment where plaintiff slipped on grease patch under poor lighting conditions). The holdings of these cases are instructive here and are consistent with Supreme Court’s holding in
 
 Howlett
 
 that vessel liability in that case hinged, in part, on whether the plastic placed under cargo was visible.
 
 See Howlett,
 
 512 U.S. at 105-06, 114 S.Ct. at 2067.
 

 Here, an unconcealed open access door would ordinarily not give rise to vessel liability because it is obvious and because the access door arrangement is familiar to and expected by stevedores and longshoremen. However, if the vessel were to turn over to the stevedore a working area with a concealed open access door, then vessel liability could arise under the turnover duty.
 

 Thus, the pivotal question here is a factual one: was the open access door covered with debris when the longshoremen began working on the morning of December 13, 1999? Although there is evidence that debris may have existed from the previous discharging operations, defendants insist — and have submitted testimony — that the crew had removed any
 
 *CDXX
 
 debris remaining from previous discharging operations and that the access doors were unobstructed at the time of the vessel was turned over to the stevedore. Plaintiff submitted general testimony from Buzzetta that the LE SHENG was an overall dirty and not well-maintained vessel. Plaintiff, however, has no evidence that Shen was lying about removing the debris. Moreover, plaintiff has no evidence at all that the open access doors were obstructed at the time the vessel was turned over to the stevedore, after which, the stevedore, not the vessel, was duty-bound to maintain a safe working environment.
 

 Accordingly, at least two plausible scenarios are possible to explain why the access door was covered — one would result in liability, the other would not. Plaintiff has no evidence to prove that the debris was placed there during previous discharging and that the crew improperly failed to clean up, rather than the likelihood that it was the longshoremen, while discharging that morning, that moved the debris over the access doors. As such, even when viewed through a most charitable prism, all that plaintiffs evidence shows is that a scenario that would create liability is plausible. Nothing in the evidence would allow a reasonable jury to conclude by a preponderance of the evidence that indeed that is what occurred.
 
 See
 
 Anderson, 477 U.S. at 252, 106 S.Ct. at 2512;
 
 Prunier,
 
 986 F.2d at 680 (“[Wjhere evidence shows ‘several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause as the other, plaintiff cannot have a recovery[.]’ ”) (quoting
 
 Bernstein v. City of New York,
 
 69 N.Y.2d 1020, 1021, 511 N.E.2d 52, 53, 517 N.Y.S.2d 908, 909 (1987) (internal quotation marks omitted));
 
 Mosel Vitelic Corp. v. Micron Tech., Inc.,
 
 2000 WL 1728346, at *2 (D.Del. Mar. 14, 2000) (“[WJhen two scenarios are equally likely, no jury could determine which one was more likely than not.... Consequently, the court will not allow it to survive summary judgment on the mere hope that more favorable evidence might develop at trial.”).
 

 Fernandez also argues that he should be given an opportunity at trial to discredit Shen’s testimony that the debris was removed. Although witness credibility is usually a question for the jury, Fernandez has not produced any evidence to impugn Shen’s credibility despite his ability to do so at the deposition. Merely “[t]o assert that [a] witness[ ] may be lying, without any evidence to contradict the witnesses’ testimony cannot defeat a motion for summary judgment.”
 
 Brown v. Johnson & Johnson Consumer Prods.,
 
 1994 WL 361444, at *4 n. 3 (S.D.N.Y. July 11, 1994) (citing
 
 Vantage Point, Inc. v. Parker Brothers, Inc.,
 
 529 F.Supp. 1204, 1213-14 (E.D.N.Y.1981),
 
 aff'd without op.,
 
 697 F.2d 301 (2d Cir.1982)). “If the most that can be hoped for is the discrediting of defendants’ denials at trial no question of material facts is presented.”
 
 Modern Home Inst., Inc. v. Hartford Accident & Indem. Co.,
 
 513 F.2d 102, 110 (2d Cir.1975),
 
 quoted in, Tomasini v. Walt Disney Co.,
 
 84 F.Supp.2d 516, 521 (S.D.N.Y. Feb.14, 2000). Accordingly, plaintiff has not presented sufficient evidence that would allow a reasonable jury to find by a preponderance that defendants were negligent.
 

 Conclusion
 

 For the foregoing reasons, defendants’ motion for summary judgment is granted. The case is dismissed. The Clerk of the Court is directed to close the case.
 

 SO ORDERED.
 

 [1]
 

 . The claims by Candida Fernandez have since been dismissed by stipulation of the parties.
 

 [2]
 

 . Plaintiff has also submitted photos depicting an open access door with debris over and around the access door. (Pl.’s Mem., at Ex. 1.) Plaintiff purports that the photos were taken immediately after Fernandez fell through the access door. However, the photos have no bearing on the outcome of this motion because defendants are not disputing, at least for purposes of the motion, that Fernandez fell through a open access door that was concealed by debris. Indeed, the manner in which the dunnage is arranged suggests that it was placed there by the longshoremen as they were discharging cargo. In any case, the photos do not shed any light on the more important question whether that debris was placed there on December 13, 1999 by the longshoreman while the hatch was under their control, or whether it existed there because of the failure of the crew to clean up the debris from a prior day.
 

 [3]
 

 . In discussing the legal standards governing vessel liability under the LHWCA, the Court quotes liberally from its previous decision in
 
 Conenna,
 
 2003 WL 255947, which similarly analyzed vessel liability under the LHWCA. For the sake of brevity and readability, future references to
 
 Conenna
 
 are omitted.
 

 [4]
 

 . Although the LHWCA "establishes a comparative rather than a contributory negligence scheme,”
 
 O’Hara,
 
 294 F.3d at 66, the open and obvious defense often completely bars recovery, and as such, the law as it has been applied by the courts "mimic[ ] the ancient contributory negligence and assumption of the risk tort doctrines.”
 
 Sinagra v. Atl. Ocean Shipping,
 
 182 F.Supp.2d at 301 n. 7;
 
 see Scindia,
 
 451 U.S. at 167, 181 n. 2, 101 S.Ct. at 1622, 1629 n. 2 (Powell, J., concurring) (arguing that vessel liability in cases involving obvious and avoidable hazards should be “limited to the unusual case in which it should be anticipated that the stevedore will fail to act reasonably”);
 
 Kirsch v. Plovidba,
 
 971 F.2d 1026, 1031 n. 6 (3d Cir.1992) ("As a general matter, courts have discussed the 'open and obvious hazard' issue as a question of the shipowner's duty, rather than under the rubric of comparative negligence.”).