OPINION OF THE COURT
Sweeny, J.P.
This case involves the application of the professional medical judgment doctrine, which, as set forth herein, warrants dismissal of plaintiffs complaint.
On April 20, 2006, plaintiffs decedent, Cooper Park, called defendant Dr. Kovachevich, an osteopathic physician and family medicine practitioner who had been his primary care provider since 1999, and told Dr. Kovachevich that he was separating from plaintiff, his wife, and needed “something because his nerves were shot.” Dr. Kovachevich called in a prescription for Xanax, and asked that Park come see him the following day.
On April 21, Park came in as directed, presenting with complaints of depression, anxiety, and an inability to sleep. Park stated he was “distraught” over his separation from plaintiff. Dr. Kovachevich discussed Park’s thoughts on suicide and Park stated that, while suicide had crossed his mind, he would never do that because he had three children. Although he did not believe that Park was at risk of hurting himself, Dr. Kovachevich told Park to consult Dr. Moss, a psychiatrist, that day. He also advised Park to immediately go to an emergency room if he had suicidal thoughts and to call him at any time. Dr. Kovachevich prescribed Lexapro and Xanax, medications used to treat anxiety and depression, and Ambien, a sedative to help Park sleep. A follow-up appointment was scheduled for April 25.
That same evening, Park called plaintiff several times in an attempt to reconcile. He told her he was going to take pills and kill himself. Plaintiff called 911 and the police took Park from his residence to Greenwich Hospital’s emergency room. The hospital record states that Park ingested Ambien and Xanax tablets “in the context of a divorce.” Park never lost conscious *185 ness and was treated with activated charcoal. On April 22, while still at Greenwich Hospital, Park had a consultation with Dr. Charles Gardner, a psychiatrist. Park denied “active suicidal ideation” and claimed to be “overwhelmed.” He refused hospitalization, telling Dr. Gardner that he had a therapist. Dr. Gardner’s impression was “adjustment disorder with depressed mood” and Park was discharged with instructions to follow up with Dr. Gardner within seven days. Park also agreed to follow up with therapy. Arrangements were made to have Park’s parents and sister stay with him.
On April 25, Park again saw Dr. Kovachevich as previously scheduled. Although Park reported that he had gone to the emergency room with thoughts of suicide and was released the next morning, he did not mention the suicide attempt. He told Dr. Kovachevich that he felt better, that his father was staying with him and that he was working. Dr. Kovachevich testified that Park’s presentation on this date was “markedly improved” from his prior visit.
On May 1, after repeatedly attempting reconciliation with plaintiff, Park ingested several tablets of Ambien, Xanax and Tylenol PM. His father found him unconscious and took him to Greenwich Hospital, where he was admitted, unresponsive and in respiratory arrest. He was intubated, placed on a ventilator and stabilized. He remained at Greenwich Hospital from May 1 through May 4, when he was transferred to defendant Payne Whitney Clinic pursuant to an involuntary inpatient psychiatric commitment. Park’s discharge diagnosis from Greenwich was suicidal ideation with a history of depression.
At Payne Whitney, Park was treated by a team of no less than seven psychiatrists, social workers and nurses who met daily to discuss his progress. Park was initially assessed by a licensed clinical social worker, which assessment was reviewed by an attending psychiatrist, defendant Dr. Shamoian. His Axis I diagnosis was “Depressive Disorder NOS (not otherwise specified)” and Axis II diagnosis was to “rule out narcissistic personality disorder.”
On May 5, Park was seen by defendant Dr. Klahr, who testified that he believed Park when he stated his April 21 suicide attempt was a “gesture,” an attempt to get plaintiffs attention. The May 1 incident, however, was considered a serious suicide attempt. Dr. Klahr noted that Park was remorseful about that attempt and denied any suicidal ideation. He was seen the same day by another team social worker who discussed his marital *186 difficulties and documented Park’s contention that he resolved to let his wife go and focus on his three daughters.
The team’s treatment goal was to have Park free of suicidal ideation and maintain impulse control for three consecutive days. To attain these goals, Park would be closely monitored, attend therapy sessions and participate in the planning process to ensure that appropriate aftercare was in place following discharge.
That same day, plaintiff called Dr. Kovachevich and advised him that Park tried to commit suicide, was in the hospital and that if Park came in to see him again, Dr. Kovachevich was not to see or treat him.
Between May 5 and 10, Park met daily with the Payne Whitney team, and attended group and individual therapy sessions. He repeatedly expressed remorse over his actions, denied suicidal ideation and told the team he would never try to hurt himself again. Park’s father agreed to stay with him as long as necessary when he was discharged.
On May 10, the team discussed Park’s condition and agreed that he no longer posed a risk to himself. In the presence of his father, Park was instructed on the need to continue his medication as well as for continuing psychotherapy. He was given the names of two psychiatrists, Dr. Tamerin and Dr. Phansalker, and was instructed to follow up with either of them. Park agreed to the treatment plan and his father stated that he would encourage him to follow up as instructed. He was discharged with a diagnosis of depressive disorder, NOS.
The next day Park met with Dr. Phansalker, who documented that he displayed “no thought disorder,” “no suicidal ideation,” and “no evidence of psychosis.” She found him to be stable and saw no reason to believe he would commit suicide. Park told her he would contact her for a follow-up appointment but never did. On May 16, Dr. Phansalker left a message for him to make an appointment. Park called back the next day and said he would seek treatment with another psychiatrist.
Park returned to work on May 15. That same day, he planned a business trip, purchasing a round trip ticket to fly from New York to Sao Paulo, Brazil, leaving May 22 and returning May 25.
On May 16, Park went to see Dr. Kovachevich, who found him markedly improved since his last visit on April 25. On May 18, Park called Dr. Kovachevich and requested a prescription for *187 Lexapro because he was going out of town on business. The next day, a Payne Whitney social worker left a message for Park to follow up regarding his outpatient treatment. On May 20, Park’s father flew back home to Australia, despite having assured Payne Whitney that he would be staying with Park indefinitely.
That same evening, Park called plaintiff to say good night to their daughter. Although told that she was asleep, Park nonetheless went to plaintiffs apartment where he had an altercation with plaintiffs boyfriend, resulting in a call to the police.
The next morning, May 21, Park was found dead in his car, which was parked in his garage with the engine running and a tube duct taped to the exhaust and leading to the inside of the driver’s side window. The garage door was closed and sealed with towels, and its windows covered with black plastic. Park’s autopsy report initially listed the cause of death as carbon monoxide poisoning, but was later amended to read death by acute mixed drug intoxication of Lexapro and Benadryl, “suicide.” Park’s blood toxicology report listed Lexapro, acetaminophen, salicylate, Ambien, naproxen, ibuprofen and Benadryl, the latter being the only drug at a near-toxic blood level.
Plaintiff commenced this action on behalf of Park’s estate against Dr. Kovachevich, David Klahr, M.D., sued herein as Dr. Aryeh Klahr, and The New York and Presbyterian Hospital, sued herein as The Payne Whitney Clinic and New York Presbyterian Hospital (collectively, Payne Whitney defendants) and other medical providers alleging, inter alla, that their prescriptions of Lexapro caused and/or contributed to Park’s suicide. Plaintiff also alleges that the Payne Whitney defendants failed to properly evaluate and diagnose Park’s condition, leading to his premature discharge from their facility.
The Payne Whitney defendants moved for summary judgment supported by, inter alla, the affirmed report of Dr. Neil Zolkind, a board-certified psychiatrist, who reviewed all the deposition testimony as well as Park’s medical records from all his medical providers and facilities. Dr. Zolkind opined that Payne Whitney, to meet the applicable standard of care, had to evaluate Park to determine whether he “require [d] in-patient treatment, and if so, the extent of treatment necessary for [him].” He stated that Payne Whitney satisfied that standard of care by having “multiple personnel with differing specialties conduct thorough evaluations of the decedent and by devising an appropriate plan of care based upon those evaluations.” Zolkind *188 observed that Payne Whitney appropriately diagnosed Park, set treatment goals, and established a treatment plan “within the range of accepted treatment choices.” As part of the plan, Dr. Klahr’s prescription of Lexapro was also appropriate, since the dosage had the potential to help Park feel less depressed. Further, since Dr. Kovachevich had previously prescribed Lexapro, as did Greenwich Hospital, it was likely that Park would remain compliant, and could be monitored by his aftercare providers.
With respect to whether a possible diagnosis of narcissistic personality disorder was properly considered, Dr. Zolkind opined that the Payne Whitney team, through numerous individual evaluations of Park over a sufficient period of time, was able to identify any narcissistic traits. These issues, according to Zolkind, cannot be effectively treated on an in-patient basis, and therefore, discharge was appropriate.
Finally, Dr. Zolkind observed that the appropriateness of Park’s discharge was demonstrated by his ability to carry out the discharge plan. He followed up with Dr. Phansalker, returned to work, scheduled a business trip to Brazil, participated in family functions and interacted with his parents and children.
Dr. Kovachevich likewise moved for summary judgment relying on the same records and testimony as the Payne Whitney defendants. He also submitted affirmed reports from Dr. Alan A. Pollock, a physician board-certified in internal medicine and infectious diseases, and Dr. Philip Muskin, a board-certified psychiatrist.
Both Dr. Muskin and Dr. Pollock agreed that, as a specialist in internal medicine and an osteopathic physician, Dr. Kovachevich was “absolutely competent to prescribe psychotropic medications to a patient” presenting with Park’s symptoms. Moreover, Dr. Kovachevich was professionally responsible in balancing his prescriptions with a “prudent” recommendation to seek psychiatric treatment.
Both experts opined that Dr. Kovachevich did not depart from accepted medical practices in continuing Ambien, Xanax and Lexapro after seeing Park on April 25, since he was unaware that Park had used Ambien in a suicidal gesture. Further, when Park presented to him on May 16 “doing much better” and reporting that he was in therapy, Park had not disclosed to Dr. Kovachevich that he made a second suicide attempt on May 1 using the Xanax and Ambien, nor did he disclose that he had been involuntarily admitted to Payne Whitney. Thus, Dr. Pol *189 lock opined that Dr. Kovachevich properly honored Park’s May 18 request for additional Lexapro in advance of his Brazil trip. Indeed, Dr. Pollack stated that the failure to renew Lexapro, which other health care providers had also prescribed, would have resulted in potentially catastrophic withdrawal symptoms for Park. Additionally, the amount of Lexapro prescribed by Dr. Kovachevich was not enough to cause an overdose. In fact, the autopsy report, Dr. Pollock, Dr. Muskin and plaintiffs expert all agreed that the level of Lexapro in Park’s blood revealed a therapeutic, not toxic level. Dr. Kovachevich’s experts both agreed that he had no control over whether Park chose to mix this prescription with Benadryl, an over-the-counter medication that was found in Park’s body at near toxic levels.
Dr. Muskin also opined that Dr. Kovachevich’s management of Park’s medications was crucial to help control his depression because Park had chosen not to follow up with any of a number of mental health care providers to whom he had been referred.
It was his opinion, based upon a reasonable degree of medical certainty, that Park’s suicide was not the result of any negligence by Dr. Kovachevich.
In opposition, plaintiff submitted a redacted affirmation from a psychiatrist who acknowledged that, while “a psychiatrist cannot prevent suicide,” the Payne Whitney defendants failed, inter alla, to diagnose Park properly with narcissistic personality disorder and that its treatment plan was flawed as a result. This expert opined that acceptable standards of care require that the risk factors here, i.e., “the marital breakup” needed to be reduced by “a combined approach of medication and individual psychotherapy.” In order to do this, information from plaintiff and his family was “clinically critical,” and the failure to contact plaintiff was a departure from good and accepted practice.
The expert asserted that, since Dr. Kovachevich was treating Park for psychiatric symptoms, his actions must be evaluated as though he was a psychiatrist. By providing Park with Lexapro, both Dr. Kovachevich and Payne Whitney were treating the wrong ailment, i.e., depression, rather than narcissistic personality disorder. Curiously, the expert asserted the treatment plan was inadequate because one or two doses of Lexapro cannot achieve a therapeutic effect as it can take up to at least a week before therapeutic levels are found in the brain. Nevertheless, since the autopsy report noted the cause of death as an overdose of Lexapro and Benadryl, plaintiff s expert opined that *190 the defendants’ combined failures were the proximate cause of Park’s suicide.
In reply, Payne Whitney argued, inter alla, that plaintiff’s expert’s opinion was conclusory, based on hindsight, and failed to identify a different course of treatment that would have averted Park’s suicide. With respect to the issue of failing to include plaintiff in Park’s treatment plan, Payne Whitney argued that this was not in plaintiff’s bill of particulars, was raised for the first time in opposition to the motion for summary judgment and, in any event, would have violated Park’s rights under the Health Insurance Portability and Accountability Act of 1996 (Pub L 104-191, 110 US Stat 1936 [HIPAA]). Dr. Kovachevich submitted a supplemental affirmation from Dr. Pollock stating that primary care providers routinely prescribe medications to treat conditions common to more specialized fields of medicine outside of general practice and that he should therefore not be held to the standards of a psychiatrist. Moreover, with respect to the alleged failure to include plaintiff in Park’s treatment plan, “a physician can only treat a patient on his or her medical history and physical presentation,” not on what a spouse or third person does or does not tell the physician.
It is well settled that “a doctor is not liable in negligence merely because a treatment, which the doctor as a matter of professional judgment elected to pursue, proves ineffective” (Nestorowich v Ricotta, 97 NY2d 393, 398 [2002]). Liability is imposed “only if the doctor’s treatment decisions do not reflect his or her own best judgment, or fall short of the generally accepted standard of care” {id. at 399). Although a plaintiff’s expert may have chosen a different course of treatment, this, “without more, ‘represents, at most, a difference of opinion among [medical providers], which is not sufficient to sustain a prima facie case of malpractice’ ” (Ibguy v State of New York, 261 AD2d 510, 510 [2d Dept 1999], lv denied 93 NY2d 816 [1999], quoting Darren v Safier, 207 AD2d 473, 474 [2d Dept 1994]). In the context of mental health providers, we have held that “[w]hen a psychiatrist chooses a course of treatment, within a range of medically accepted choices, for a patient after a proper examination and evaluation, the doctrine of professional medical judgment will insulate such psychiatrist from liability” (Durney v Terk, 42 AD3d 335, 336 [1st Dept 2007], lv denied 9 NY3d 813 [2007] [internal quotation marks omitted]; see Centeno v City of New York, 48 AD2d 812 [1st Dept 1975], *191 affd 40 NY2d 932 [1976]; Betty v City of New York, 65 AD3d 507 [2d Dept 2009]). Where a psychiatrist fails to predict that a patient will harm himself or herself if released, liability will likewise not attach for a mere error in professional judgment (Schrempf v State of New York, 66 NY2d 289, 295 [1985]; Ozugowski v City of New York, 90 AD3d 875, 876 [2d Dept 2011]). While it is true that “the line between medical judgment and deviation from good medical practice is not easy to draw” (Topel v Long Is. Jewish Med. Ctr., 55 NY2d 682, 684 [1981]), the
“prediction of the future course of a mental illness is a professional judgment of high responsibility and in some instances it involves a measure of calculated risk. If a liability were imposed on the physician or the State each time the prediction of future course of mental disease was wrong, few releases would ever be made and the hope of recovery and rehabilitations of a vast number of patients would be impeded and frustrated” (Centeno, 48 AD2d at 813).
However, if a decision to release a patient was less than a professional medical determination, liability may attach (see O’Sullivan v Presbyterian Hosp. in City of N.Y. at Columbia Presbyt. Med. Ctr., 217 AD2d 98, 100 [1st Dept 1995]). A decision will not be insulated by the medical judgment rule if it is not based upon a careful examination (see Thomas v Reddy, 86 AD3d 602, 604 [2d Dept 2011]).
Generally, “ ‘the opinion of a qualified expert that a plaintiffs injuries were caused by a deviation from relevant industry standards would preclude a grant of summary judgment in favor of the defendants’ ” (Diaz v New York Downtown Hosp., 99 NY2d 542, 544 [2002], quoting Murphy v Conner, 84 NY2d 969, 972 [1994]). To suffice, the expert’s opinion “must demonstrate ‘the requisite nexus between the malpractice allegedly committed’ and the harm suffered” (Dallas-Stephenson v Waisman, 39 AD3d 303, 307 [1st Dept 2007], quoting Ferrara v South Shore Orthopedic Assoc., 178 AD2d 364, 366 [1st Dept 1991]). However, where “the expert’s ultimate assertions are speculative or unsupported by any evidentiary foundation, . . . the opinion should be given no probative force and is insufficient to withstand summary judgment” (Diaz, 99 NY2d at 544).
The Payne Whitney defendants established their entitlement to judgment as a matter of law by tendering, inter alia, deposition testimony, the affirmed reports of their experts, and *192 their office charts and hospital records. Although plaintiff contends that they failed to perform a proper assessment of Park prior to discharge, her expert does not elaborate on how their evaluation, conducted by at least seven health care professionals in several different disciplines, was deficient or what steps they should have taken to bring it within acceptable medical standards. Moreover, the contention by plaintiff’s expert that Payne Whitney should have “reached out” to plaintiff, who the expert conceded was a main stressor for Park, is improperly raised for the first time in plaintiffs opposition papers (see Abalola v Flower Hosp., 44 AD3d 522 [1st Dept 2007]), and in any event, lacks merit. The expert does not explain what, if any, information plaintiff could have provided or how such information would have been relevant to Park’s diagnosis and treatment. These omissions render the opinion conclusory (see Davis v Patel, 287 AD2d 479, 480 [2d Dept 2001]). In addition, as noted above, contacting plaintiff would have constituted a HIPAA violation and exposed Payne Whitney to other liability (see CPLR 4504).
Significantly, plaintiffs expert’s opinion that Payne Whitney’s alleged failure to diagnose Park’s “narcissistic personality disorder” was a departure from accepted care is also conclusory, since plaintiffs expert did not make any evaluation of Park and failed to provide support in the record for this conclusion (see Foster-Sturrup v Long, 95 AD3d 726, 728 [1st Dept 2012]). “[O]pinion evidence must be based on facts in the record or personally known to the witness” (Cassano v Hagstrom, 5 NY2d 643, 646 [1959]). Plaintiff was required to demonstrate that the Payne Whitney defendants departed from the standard of care in treating Park and that those departures were the proximate cause of his death (Dallas-Stephenson v Waisman, 39 AD3d at 306-307). The unsupported opinion that Payne Whitney failed to perform a proper evaluation of Park prior to discharge reflects a “reasoning back” from the fact of an injury to find negligence, and is not sufficient to defeat a summary judgment motion (see Fernandez v Moskowitz, 85 AD3d 566, 568 [1st Dept 2011]; Brown v Bauman, 42 AD3d 390, 392 [1st Dept 2007]).
Simply put, plaintiff’s expert merely presents a different course of treatment, which is insufficient to defeat Payne Whitney’s prima facie showing of entitlement to summary judgment (Ibguy, 261 AD2d 510).
Similarly, Dr. Kovachevich met his prima facie burden through, inter alla, the affirmed reports of Dr. Pollock and Dr. *193 Muskin. Both physicians opined that the amount of Lexapro prescribed by Dr. Kovachevich was insufficient for an overdose and that the amount of Lexapro in Park’s blood was at therapeutic levels. This lack of causal connection between Dr. Kovachevich’s actions and Park’s suicide severs liability (Foster-Sturrup, 95 AD3d at 728; Dallas-Stephenson, 39 AD3d at 307).
Additionally, plaintiffs claim that Dr. Kovachevich should be held to the standard of care of a psychiatrist was improperly raised for the first time in her expert’s affirmation and we decline to consider this new theory of liability (Abalola, 44 AD3d 522).
Since plaintiff has not met her burden of raising a triable issue of fact, defendants’ motions should have been granted.
Accordingly, the order of the Supreme Court, New York County (Alice Schlesinger, J.), entered March 19, 2013, which denied the motions of defendant Dr. Thomas Kovachevich and the Payne Whitney defendants for summary judgment dismissing the complaint as against them, should be reversed, on the law, without costs, and the motions granted. The Clerk is directed to enter judgment accordingly.
Andrias, Freedman, Richter and Clark, JJ., concur.
Order, Supreme Court, New York County, entered March 19, 2013, reversed, on the law, without costs, and defendants’ motions granted. The Clerk is directed to enter judgment accordingly.