# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 6, 2011

No. 11-30076

Lyle W. Cayce
Clerk

MARK HUDSON,

Plaintiff - Appellant

v.

SCHLUMBERGER TECHNOLOGY CORPORATION, ALPHA MARINE
SERVICES, INC., and BP EXPLORATION AND PRODUCTION, INC.,

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:08-CV-4754

Before HIGGINBOTHAM, STEWART, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Mark Hudson ("Hudson") appeals from a motion for summary judgment granted by the district court in favor of Defendants-Appellees. Hudson filed suit on October 28, 2008, against his employer Schlumberger Technology Corporation ("STC"), Alpha Marine Services, Inc. ("Alpha"), and BP Exploration and Production, Inc. ("BP") for injuries he sustained while aboard the M/V C-Commander (the "vessel"). The vessel was owned and operated by Alpha, though a BP representative was aboard the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

vessel. BP time chartered the vessel from Alpha and contracted with STC[1] to provide seismic services aboard the vessel.

The district court ultimately granted summary judgment to Alpha and BP, and Hudson timely appealed. He argues that the district court applied the wrong negligence standard and that even under the standard adopted by the district court, summary judgment is not appropriate because there is a material issue of disputed fact. For the following reasons, we AFFIRM.

## I. BACKGROUND

In the early morning of May 1, 2008, Hudson was spooling seismic lines from the aft deck of the vessel when he allegedly stepped in an uncovered "pad-eye" hole and injured his knee. Though Hudson admits that he knew some of the vessel's pad-eye holes were uncovered, he alleges that poor lighting and a film of sea water covering the deck contributed to his accident because it made identification of the holes difficult in the early morning light. At the time of the incident, the deck light had been turned off by the boat's captain because the sun was coming up. Hudson and his fellow worker, Mark Boatwright (also employed by STC) were the only workers on deck at the time of Hudson's injury. The only BP representative aboard the vessel was asleep below deck, and no Alpha employees were on deck because STC had requested they not be in the area while seismic operations were underway.

The vessel was equipped with many pad-eyes to be used to tie down heavy equipment when necessary. These pad-eyes have covers, which may be used to cap otherwise exposed holes. Hudson contends that Alpha was in complete

---

[1] Though STC is a party to this appeal, Hudson's brief only seeks relief from the district court's ruling related to Alpha and BP. Hudson has thus waived—and we do not address—any issue as it relates to STC. *See, e.g.*, *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009) (citing *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 407 n.9 (5th Cir. 2009)).

charge of the vessel, supervised everyone on board, and, despite Hudson's prior inquiries, insisted the covers remain off the pad-eye holes to prevent them from washing overboard. Moreover, Hudson avers that Willy Davis ("Davis"), BP's representative, directed the outfitting and inspection of the vessel, as well as the work being done, to assure that working conditions were safe. As a result of the investigation that followed Hudson's accident, Davis recommended covering the pad-eye holes in the future.

## II.  STANDARD OF REVIEW

"We review a district court's grant of summary judgment *de novo*, applying the same standards as the district court." *Noble Energy, Inc. v. Bituminous Cas. Co.*, 529 F.3d 642, 645 (5th Cir. 2008). As such, summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). This standard is based not solely on "whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citation omitted). In addition, we must "construe all facts and inferences in the light most favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). Ultimately, however, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III. DISCUSSION

In his appeal, Hudson contends that *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625 (1959), not *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981), should serve as the proper standard to judge

the conduct underlying his claim under § 905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA").[2] In this respect, Hudson avers that the district court applied the wrong standard to his claim by applying *Scindia*'s three vessel-owner duties, rather than *Kermarec*'s "reasonable care" approach. Hudson then argues that even if *Scindia* is the appropriate standard under the LHWCA, the district court erred in applying *Scindia*. Because we apply a different standard to Alpha than to BP, we address Hudson's claim against each defendant in turn.

## A. *Hudson's Claim Against Alpha*

### *1. The Proper Negligence Standard for a Vessel Owner Under LHWCA*

Hudson argues on appeal that the limited duties imposed in *Scindia* do not apply to longshoremen who are not performing stevedoring services on the vessel. In his view, the policy behind *Scindia* is not furthered by application to claimants who obtain LHWCA status only by virtue of working on the Outer Continental Shelf ("OCS"). He thus likens himself to a passenger under *Kermarec*, who is owed the duty of exercising reasonable care under the circumstances. *See* 358 U.S. at 632.

We conclude that Hudson's argument is unavailing. *Scindia* is not limited to the stevedoring context: "It clearly applies to any independent contractor and

---

[2] 33 U.S.C. § 905(b) provides in relevant part:

> In the event of injury to a person covered under this chapter caused by the negligence of the vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this Act, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. . . .

its harborworker employees covered by the LHWCA and working aboard ship." *See, e.g.*, *Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322, 1326-27 (5th Cir. 1985) (quoting *Hill v. Texaco, Inc.*, 674 F.2d 447, 451 (5th Cir. 1982) (applying *Scindia* to an independent contractor employed to determine the effect of rust on the thickness of vessel tank walls)).[3]   Relevant here, longshoremen covered by the Act include anyone "engaged in maritime employment," 33 U.S.C. § 902(3), and recovery is conditioned explicitly on injury occurring while the vessel is "upon the navigable waters of the United States." *Id.* at § 903(a).

Furthermore, Hudson has not directed us to any support for his proposition that he is a longshoreman under the LHWCA solely by virtue of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1333(b). Section 1333(b) of the OCSLA extends the recovery provisions of the LHWCA to injuries suffered by "an employee resulting from any injury occurring as the result of operations conducted on the outer Continental Shelf for the purpose of exploring for, developing, removing . . . the natural resources . . . of the subsoil and seabed of the outer Continental Shelf." We have held that this provision only applies if the employee meets both the status and situs requirements of § 1333. *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 498 (5th Cir. 2002), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 787 (5th Cir. 2009) (en banc). Hudson's employment would not satisfy the situs test

---

[3] Several other cases in this Circuit have reaffirmed that *Scindia* is not limited to longshoremen acting in stevedoring capacities. *See, e.g.*, *Fontenot v. McCall's Boat Rentals, Inc.*, 227 F. App'x 397, 403 n.2 (5th Cir. 2007) (unpublished) ("This court has held that the principles of *Scindia*, though formulated in the context of the respective duties of vessel owners and stevedores, apply equally to any suit by an LHWCA-covered employee working for an independent contractor aboard a vessel."); *see also Teply v. Mobil Oil Corp*, 859 F.2d 375 (5th Cir. 1988) ("The Supreme Court interpreted § 905(b) as it applies to stevedores, but in principle as [sic] it applies to other harborworkers who work on board vessels as well . . . ."); *Futo v. Lykes Bros. S.S. Co.*, 742 F.2d 209, 210 (5th Cir. 1984) (applying *Scindia* to injury suffered by independent contractor hired by a shipowner to perform vessel repairs).

because he was not located at "(1) the subsoil and seabed of the OCS; [or] (2) any artificial island, installation, or other device" permanently or temporarily attached to, and erected on, the seabed. *Id.* at 497; *see also Alleman v. Omni Energy Servs. Corp.*, 580 F.3d 280, 283 (5th Cir. 2009) ("The controversy must arise on a situs covered by OCSLA (*i.e.,* the subsoil, seabed, or artificial structures permanently or temporarily attached thereto)."); *Grand Isle Shipyard*, 589 F.3d at 784 ("In a tort action, if the tort occurs on navigable water instead of a fixed platform (or other structure attached to the seabed), the OCSLA situs requirement is not met.").

It is undisputed that Hudson was engaged in maritime employment, *Boudreaux v. Am. Workover, Inc.*, 680 F.2d 1034, 1038-39 (5th Cir. 1982) (finding that "an employee injured on the waters in the course of his employment satisfies the 1972 revision's 'maritime employment' test"), and that the injury occurred over covered navigable waters, *see Reynolds v. Ingalls Shipbuilding Div., Litton Sys., Inc.*, 788 F.2d 264 (5th Cir. 1986), *overruled on other grounds by Steward v. Dutra Construction Co.,* 543 U.S. 481, 496 (2005) (navigable waters of the United States may include the high seas); *see also Ex parte Easton*, 95 U.S. 68, 72 (1877) ("Public navigable waters, where inter-state or foreign commerce may be carried on, of course include the high seas . . . ."). Because Hudson is a longshoreman under the LHWCA by virtue of his maritime employment and was injured while working in the scope of his employment over navigable waters, his potential recovery under § 905(b) is subject to the *Scindia*, not *Kermarec*, standard.

2. *Applying* Scindia *to Hudson's Claim Against Alpha*

The Supreme Court in *Scindia* defined a vessel's duty to longshoremen under the 1972 amendments to the Act. The Court held that a vessel owner

must provide work space, equipment, and tools in a condition that allows a stevedore, acting with reasonable care, to carry on his operations with reasonable safety. 451 U.S. at 166-67. The owner must warn the stevedore of hidden dangers that the owner knows, or should know, about in the exercise of reasonable care. *Id.* Importantly, the owner need not supervise, inspect, or monitor the stevedoring operations for dangerous conditions that develop during the work relationship. *Id.* at 169-72. *Scindia* provided a pertinent exception to this limitation, however, if the vessel owner becomes aware of a dangerous condition that constitutes the danger. *Id.* at 172-76.

Based on these principles and the fact that "the primary responsibility for the safety of the longshoremen rests upon the stevedore," *Randolph v. Laeisz*, 896 F.2d 964, 970 (5th Cir. 1990), we have outlined three instances where vessel owner liability may still be established in favor of the longshoreman:

> 1) if the vessel owner fails to warn on turning over the ship of hidden defects of which he should have known.
>
> 2) for injury caused by hazards under the control of the ship.
>
> 3) if the vessel owner fails to intervene in the stevedore's operations when he has actual knowledge both of the hazard and that the stevedore, in the exercise of obviously improvident judgment, means to work on in the face of it and therefore cannot be relied on to remedy it.

*E.g.*, *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1245 (5th Cir. 1997) (internal quotations and citations omitted).

We hold that Hudson has not raised a material issue of disputed fact that Alpha breached one of the three *Scindia* duties. First, Alpha did not violate its turnover duty by failing to warn Hudson of hidden defects. "The 'turnover duty' relates to the condition that an expert and experienced stevedoring contractor,

mindful of the dangers he should reasonably expect to encounter will be able by the exercise of ordinary care to carry on cargo operations with reasonable safety to persons and property." *Moore v. Angela MV*, 353 F.3d 376, 380 (5th Cir. 2008). However, "merely proving that an unsafe condition existed at the time of the accident is insufficient to establish liability." *Treadaway v. Societe Anonyme Louis-Dreyfus*, 894 F.2d 161, 166 (5th Cir. 1990). More importantly, "[t]he defendant has not breached its duty to turn over a safe vessel if the defect causing injury is open and obvious and one that the longshoreman should have seen." *E.g.*, *Greenwood*, 111 F.3d at 1246 (citations omitted). "If the longshoreman knew of the defect, then it is considered open and obvious." *Id.*; *see also Scindia*, 451 U.S. at 167 (a vessel's duty to warn extends to defects unknown to "the stevedore and which would not be obvious to or anticipated by him if reasonably competent in the performance of his work"). That being said, even if a hazard is "open and obvious," a vessel owner may still be liable where the employee has no alternative but to work in the unsafe condition or leave the job. *Kirksey v. Tonghai Maritime*, 535 F.3d 388, 396 (5th Cir. 2008); *see Morris v. Compagnie Maritime des Chargeurs Reunis*, 832 F.2d 67, 71 (5th Cir. 1987) (a longshoreman faced with such a hazard "need show only that the circumstances made safer alternatives unduly impractical or time-consuming").

Hudson conceded here that he was aware of the hazard and that any employee facing an unsafe condition could stop the job. Though Hudson alleges the pad-eye problem was pointed out to Alpha and BP, he does not contend that anyone prevented him from covering the pad-eyes while he was working or that he had no alternative but to work with the hazard or leave the job. The district court was also correct in concluding that Hudson knew "of the numerous, uncovered pad-eye holes, which were marked with orange paint." We agree with

the district court that Hudson has not raised a material issue based on the first *Scindia* duty.

As to the second *Scindia* duty—for injury caused by hazards under the control of the ship—Hudson has not established an issue of disputed material fact. The district court relied on our unpublished opinion in *Fontenot*, 227 F. App'x at 403-04, for the proposition that "a vessel captain's undisputed general authority regarding the entirety of the vessel does not equate to the 'active or operational' control contemplated by the second *Scindia* duty." *Accord Pimental v. LTD Canadian Pac. BUL*, 965 F.2d 13, 16-17 (5th Cir. 1992) (finding vessel owner lacked active control where crane that caused injury was necessary to the stevedore's work and was being operated by the stevedore); *Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir. 1997); *Turner v. Costa Line Cargo Servs.*, 744 F.2d 505, 508-09 (5th Cir. 1984) (finding vessel owner had active control where hazard was outside the longshoreman's work area). To determine whether a vessel owner retains active control over the contractor's work, we generally consider "whether the area in question is within the contractor's work area, whether the work area has been turned over to the contractor, and whether the vessel owner controls the methods and operative details of the stevedore's work." *Dow v. Oldendorff Carriers GMBH & Co.*, 387 F. App'x 504, 507 (5th Cir. 2010) (unpublished); *see Fontenot v. United States*, 89 F.3d 205, 208 (5th Cir. 1996).[4]

---

[4] We stated in *Fontenot*: "We have interpreted the second *Scindia* test in the *Futo*, *Turner*, and *Pimental* cases. We made plain in *Futo* that a vessel owner will not trigger a duty by having its employees board the vessel daily 'to ensure the security of the ship and to check on the progress of the contractor's work.' [742 F.2d at 210.] In *Turner* we found a vessel owner liable for a fall suffered when the worker was required to 'venture outside of the area of normal and routine cargo operations to areas within the ship's control and was forced to cross the oil slick in a location outside of his work area.' [744 F.2d 505.] In *Pimental* we found no liability existed under the second *Scindia* test because the fall occurred in an area turned over

These factors all support Alpha's position. Indeed, the record shows that Alpha was actually restricted to some extent from accessing the area in which Hudson was working while he was performing his seismic duties. Though the lighting was controlled by Alpha, the record shows the pad-eyes were plainly visible. Ultimately, we are unwilling to extend the second *Scindia* duty to a vessel owner for the condition of a part of the ship that was turned over to the contractor and from which the ship's crew was discouraged from entering.

The third *Scindia* duty, the duty to intervene when the vessel owner has actual knowledge of the hazard and that the worker imprudently means to work through the hazard, is equally unavailing for Hudson. As the district court correctly ruled, the defendant must not only know that the hazard creates an unreasonable risk of harm, but that the stevedore was exercising "obviously improvident judgment" in response to that risk. While the district court accepted as true that all of Alpha's personnel were aware that some pad-eye holes were usually uncovered and that the captain could have overseen Hudson's work from his vantage point in the wheelhouse, Hudson did not provide any evidence showing that Alpha's employees knew Hudson and his fellow STC employee were exercising "obviously improvident judgment." To make such a showing, the "expert stevedore must use an object with a defective condition that is so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm—even when the stevedore's expertise is taken into account." *Greenwood*, 111 F.3d at 1249 (citations omitted).

Hudson nonetheless argues that the district court improperly added an additional factor to *Scindia*'s third duty, requiring not only that the vessel owner know of the hazard, but that the vessel owner knows that the

---

to the stevedore. [965 F.2d 13.]" 89 F.3d at 208.

longshoreman—utilizing "obviously improvident judgment"—continues to work on in the face of the hazard. In fact, our precedent makes clear that this is exactly what is required; "a vessel has a duty to intervene when it has actual knowledge of a dangerous condition and actual knowledge that the stevedore, in the exercise of 'obviously improvident' judgment, has failed to remedy it." *Id.* at 1248 (quoting *Pimental*, 965 F.2d at 17); *see, e.g.*, *Laeisz*, 896 F.2d at 971 ("Under *Scindia* the vessel only had a duty to intervene if 1) it had actual knowledge that the damaged gangway posed an unreasonable risk of harm and 2) actual knowledge that it could not rely on the stevedore to protect its employees and that if unremedied the condition posed a substantial risk of injury."); *see also Woods v. Sammisa Co.*, 873 F.2d 842, 853 (5th Cir. 1989) (finding a jury instruction on the third *Scindia* factor improper where even though the defendants knew of a certain cargo condition, there was no evidence that the defendants knew it created an unreasonable risk of harm).

Notably, the record here is absent of any indication that Alpha knew Hudson and Boatwright's work around the uncovered pad-eyes created an unreasonable risk of harm and that STC could not be relied on to address the potential hazard. Even Boatwright conceded that he had worked around uncovered pad-eyes many times and "didn't feel it was a big deal." Further, a maritime expert noted that Hudson was not unreasonable in working around the pad-eyes at the time of the incident. Given the narrowness of *Scindia*'s duty to intervene, even if we were to assume Alpha had knowledge of a potential hazard, Hudson has not shown a genuine issue of material fact either that STC's work was done with obvious imprudence, or that Alpha had any knowledge if it was.

**B. Hudson's Claim Against BP**

BP's role as a time charterer, rather than traditional vessel owner,[5] further cabins its obligations with respect to liability under § 905(b). To be clear, § 905(b) claims are limited to suits for negligence against a "vessel." The LHWCA § 2(21) defines "vessel" as the vessel upon which a covered employee is injured, "and said vessel's owner, owner *pro hac vice*, agent, operator, charter or bare boat charterer, master, officer, or crew member." Given this designation, BP, as the vessel's time charterer, can be subject to liability under § 905(b). *See, e.g.*, *Kerr-McGee v. Ma-Ju Marine Servs., Inc.*, 830 F.2d 1332, 1338-39, 1343 (5th Cir. 1987); *see also Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1519-20 (5th Cir. 1996), *overruled on other grounds by Grand Isle Shipyard*, 589 F.3d at 786. However, a time charterer like BP, which is a vessel under § 5(b) solely because it is a charterer, "is subject to liability under section 5(b) only for negligence in its 'time-charterer' capacity." *Kerr-McGee*, 830 F.2d at 1339. This means that "the duties and responsibilities against which the claim of the defendant's negligence must be measured are necessarily limited to those which arise out of and are founded on the relationship which the time-charter establishes between the defendant and the vessel." *Id.*; *see Hodgen*, 87 F.3d at 1517 ("[O]ur cases . . . suggest that a time charterer owes a hybrid duty arising from tort and contract law to exercise the control the charter affords it over the timing, route, and cargo of a vessel's journey in a reasonably prudent manner.").

We addressed the liability of time charterers under § 905(b) in *Kerr-McGee*. 830 F.2d at 1340. There we held that the responsibility of the time charterer is generally determined by its charter agreement with the vessel

---

[5] Nor is BP a bare boat charterer or owner *pro hac vice*, both types of charter that require the chartering company to man the vessel and provide the charterer unrestricted use of the vessel. *Trussell v. Litton Sys., Inc.*, 753 F.2d 366, 368 (5th Cir. 1984), *overruled on other grounds by Richendollar v. Diamond M Drilling Co.*, 819 F.2d 124 (5th Cir. 1987).

owner. *Id.*; *see also Hodgen*, 87 F.3d at 1520 ("[U]nless the parties have . . . varied the traditional allocation of responsibility, a time charterer owes no duty beyond these spheres."); *Mallard v. Aluminum Co. of Canada, Ltd.*, 634 F.2d 236, 242 n.5 (5th Cir. 1981); *Migut v. Hyman-Michaels Co.*, 571 F.2d 352, 355 (6th Cir. 1978) (holding that the time charterer was not liable for damages suffered by a longshoreman who fell through an uncovered deck hatch). This means that, apart from the charter agreement, a time charterer will only be liable for its responsibilities in relation to its sphere of control over the commercial activities of the vessel—*e.g.* designating cargo placement, travel destination, subjecting the vessel to treacherous conditions, and the time frame in which the vessel will perform its assignment—rather than the condition of the vessel under control of the vessel owner. *See, e.g., Hodgen*, 87 F.3d at 1520; *Kerr-McGee*, 830 F.2d at 1341; *Dahlen v. Gulf Crews, Inc.*, 281 F.3d 487, 496 (5th Cir. 2002).

Given our conclusion above concerning Alpha's responsibility, Hudson has not shown that BP is accountable in its traditional sphere as time charterer and must point to something different that obligates BP to Hudson. Hudson argues, without citation to any authority, that BP's "obligations and responsibilities to [him] are governed not only by the charter contract, but also by the practical relationship and activities actually performed by the charterer." He also argues that Section 4.03 of the charter contract, giving BP the right to inspect Alpha's work and stop work "not performed to a satisfactory standard" requires BP to ensure Hudson's safety. Finally, he points to the presence of BP's "safety man,"

Davis, as supporting his argument that BP was actively overseeing the vessel premises.[6]

The contract, however, specifically contemplates the vessel owner maintaining "proper superintendence and performance of the Work and . . . resolv[ing] all problems which may arise in the normal day-to-day performance of the Work."  Moreover, it states that "[t]he operation, management, and navigation of the Vessel shall be under the exclusive control and command of Owner and its [crew] during the time of th[e] Contract.  Owner shall remain responsible at all times for the safe operation and navigation of the Vessel, its management and crew, and all other matters as if the Vessel were operating for Owner's sole account."

Nor was BP responsible for inspecting the vessel for safety purposes. Indeed, the contract provides that the "Owner's inspections of Owner's Property shall be performed as often as may be necessary to discover any and all defects, potential sources of injury or dangerous or defective conditions and operations." Though BP had the right to witness those inspections, its role was strictly "limited to certification that Owner . . . performed the inspections. The general quality of the inspections themselves is the sole duty and responsibility of

---

[6] In a case involving general maritime negligence duties outside of the LHWCA, we found that a time charterer that gave general safety instruction to subcontractors and participated in disembarkment procedures traditionally within the scope of the vessel owner's duties did not alter the traditional time charterer role or the duty it owed to the vessel's passengers. *See Forrester v. Ocean Marine Indem. Co.*, 11 F.3d 1213, 1216-17 (5th Cir. 1993) ("[W]e find [these facts] insufficient as a matter of law to show that Arco usurped the traditional control that is retained by the vessel's crew in a time charter situation.  Smith's gesture to the passengers is at best minimal participation in disembarkment.  Moreover, Arco's general safety instructions to its employees – instructions presumably given by most employers – does not by themselves [sic] prove that Arco exceeded its traditional role of time charterer.  Consequently, Arco assumed no safe access duty to the vessel's passengers.  It could not, therefore, be responsible for their injury in the process of disembarking.").

Owner.  In addition, Charterer shall have the right, but not the obligation, to witness any maintenance performed by Owner."

Ultimately, the contract does not alter BP's traditional sphere of control over the commercial activities of the vessel.  Moreover, as the district court pointed out, Hudson "does not cite to any evidence . . . demonstrating that Mr. Davis, or any other BP employee, . . . directed STC's operations aboard the vessel such that BP maintained [active control]" over the vessel.  Rather, Davis only oversaw STC's initial setup of the seismic equipment aboard the vessel and was asleep below deck at the time of the injury in question.[7]

We thus conclude that Hudson has failed to raise a material fact issue about BP's liability under § 905(b).  Hudson's burden of demonstrating a genuine issue of fact is not satisfied merely by creating "some metaphysical doubt as to the material facts" or by "conclusory allegations."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  Thus, it cannot be said that BP was responsible for maintaining the safety of the M/V C-Commander's aft deck, either by custom or agreement, and Hudson has no § 905(b) claim against BP as a matter of law.

## IV. CONCLUSION

For the above-mentioned reasons we AFFIRM the ruling of the district court, granting summary judgment in favor of Defendants-Appellees.

---

[7] Insofar as the charter agreement requires contractors to meet company safety requirements and to establish a behavior-based safety program, it is not clear that this provision imposes a duty on BP.  Moreover, Hudson has not briefed this argument so it is waived.  *See, e.g.*, *Ackerson*, 589 F.3d at 208.

-15-