[49 NYS3d 449]

Wayne Schnapp, Appellant, v Miller's Launch, Inc., Respondent.

First Department, March 23, 2017

34

### APPEARANCES OF COUNSEL

*Hofmann & Schweitzer*, New York City (*Paul T. Hofmann* of counsel), for appellant.

*Rubin, Fiorella & Friedman, LLP*, New York City (*Michael Evan Stern* and *Joseph R. Federici* of counsel), for respondent.

### OPINION OF THE COURT

ACOSTA, J.P.

This action seeks damages for personal injuries allegedly suffered by plaintiff Wayne Schnapp when he embarked upon a vessel by jumping from a bulkhead approximately 40 inches from the deck of the vessel. The appeal raises issues about the various duties that a vessel owner owes a harbor worker asserting a claim pursuant to the Longshore and Harbor Workers' Compensation Act (LHWCA) (33 USC § 901 *et seq.*) (*see Scindia Steam Nav. Co. v De los Santos*, 451 US 156 [1981]). We find that under the circumstances of this case, there are issues of fact as to whether defendant violated the turnover duty as well as the duty to intervene.

Plaintiff was employed by nonparty Weeks Marine, Inc., as a surveyor at a project working on the Spuyten Duyvil Bridge. Since portions of the bridge were only accessible by water, Weeks's employees were transported by launch owned by defendant Miller's Launch, Inc. and operated by its crew.

Under the terms of the charter agreement between Weeks and Miller's, Miller's would provide Weeks with a dedicated launch boat and a survey boat for up to 10 hours of continuous operation a day. The boats would be available for the exclusive use of Weeks. Weeks agreed to indemnify and hold Miller's harmless from any and all claims for personal injury, except those claims "arising from the negligence or willful misconduct of [Miller's] or the unseaworthiness of the vessel(s) provided."

On April 14, 2008, plaintiff took the launch (the Marguerite Miller, a 42 foot vessel), captained by Martin Plage, from the Spuyten Duyvil Bridge to Weeks's facility at Greenville, New Jersey, to transport two port-a-johns for cleaning. He and Plage

were the only people on board the Marguerite for that trip. Plaintiff's responsibilities on that trip included "get[ting] ahold" of Eric, a person in charge of the Greenville yard, and letting Eric know that he had arrived and that he was there to "swap out toilets and whatever [he] may have had to bring back and to get [Eric] to get a forklift and unload it." The actual loading and unloading of the port-a-johns were to be handled by other workers.

When docking at the Greenville facility, Plage would always bring the Marguerite to the same slip. Plaintiff testified that he did not need to instruct Plage where to go; Plage "pretty much knew" because they had done it before. When Plage docked at the facility, he would not tie up the vessel to the bulkhead dock. Instead, he would leave the engines running in reverse to keep the stern of the Marguerite against the bulkhead. When they arrived on the day of the accident, plaintiff told Plage that he would be "right back," and disembarked the Marguerite by climbing up the bulkhead wall. He located Eric, and they both returned to where the Marguerite was docked.

Upon reaching the Marguerite, Eric boarded the vessel by jumping down off the bulkhead onto the boat's deck. That day the distance between the bulkhead and the boat deck was a little more than it was at other times, about four feet. Plaintiff asked Eric to help him board by standing still, so he could place his hands on Eric's shoulders while he jumped down. Plaintiff jumped, and when he landed, he fractured his tibia and fibula. Plaintiff remained on the boat until Walter, a Weeks yard man, brought over a gangway, and plaintiff was assisted off the boat. Plaintiff assumed that the gangway was owned by Weeks; it did not come off the Marguerite. Plage had no involvement in plaintiff's decision to jump onto the Marguerite, and was not on the deck as plaintiff attempted to board. Plaintiff believed that Plage was in the wheelhouse. While plaintiff knew Weeks had gangways available at the facility, he did not ask to use one to board that day. He testified at his deposition that jumping "was the way you got on and off the boat. They never gave you any means to get on and off the boat anywhere that you were at."

Captain Plage testified that the location and timing of his trips were decided by Weeks employees. The Weeks facility at Greenville yard was "kind of run-down." The facility was large, and as Plage was not familiar with it or its dangers, he would

not have selected where to dock. When they approached the Weeks facility on the date of the incident, plaintiff contacted "someone as to where the boat should go or there was some determination." Plage's best recollection was that when they docked that day there was a distance of at least two feet, but no more than four feet, between the deck of the Marguerite and the top of the bulkhead dock. Plage did not see plaintiff embark, nor did he have a recollection of watching plaintiff disembark; he had remained in the wheelhouse, awaiting his next order via a VHF channel or cell phone. The next time Plage saw plaintiff was when he was lying on the deck of the vessel.

On the day of the incident, there was no portable stair or step for use on the Marguerite. In response to the deposition question, "Does the Marguerite . . . to your knowledge . . . carry a ladder to assist passengers to get from the higher height down to the deck of the Marguerite when boarding?" Plage responded, "Sometimes."

Sven Van Batavia, vice-president of operations at Miller's, testified that Miller's policy is to use the gangway provided by the facility where its boat is docking. The vessels cannot carry their own gangways, because a vessel of that size does not have the room to carry one long enough for all situations, and since they were docking at facilities not operated or controlled by Miller's, they had no way of determining the proper gangway. It is Miller's stated policy that the person disembarking is the one who makes the decision as to whether it is safe to get on or off the vessel. In terms of where to dock, while the captain considers whether the location could cause the vessel to run aground, so long as there is ample water under the hull and nothing in the waterway that could harm the vessel, Miller's will dock where directed by its client.

According to Miller's safety manual, employees are not to climb on and off equipment when the vessel is in motion. Regarding "Dockside Transfers," the manual provides:

> "Should a gangway be unavailable to transfer from or to a shore side installation, transfers may be effected using appropriate alternate means of ingress or egress, the decisions as to whether or not the alternate means is safe and acceptable must be made by the individuals being transferred. Under no circumstances should any transfer be undertaken on any object that is not secured or steady."

Plaintiff alleged in his complaint that he is a covered employee under the LHWCA who was injured by unsafe and inherently dangerous conditions to the vessel, and by a violation of the International Safety Management Code.

While the matter was initially removed to federal court pursuant to the maritime Limitation of Liability Act (LOLA), the matter was remanded back to state court, with Miller's retaining the right to return to federal court for LOLA relief upon completion of litigation.

Miller's moved for summary judgment, arguing that it was not negligent, and that a claim of "unseaworthiness" is precluded by the LHWCA. Miller's provided an affidavit from Sven Van Batavia, who averred consistently with his deposition. Specifically, he stated that plaintiff directed Plage as to where to dock the vessel. Plage, who was in the wheelhouse, was unaware of plaintiff's intention to jump onboard, and it is Miller's policy to allow the passenger to decide whether it is safe to embark or disembark from a vessel. Miller's vessels do not carry their own gangways because there is no space onboard for a gangway of a sufficient length that could be used at all docking stations, and the Weeks facility had ladders and gangways available.

In support of his opposition, plaintiff annexed the expert report of maritime safety consultant and former Coast Guard officer Alan Blume. Blume opined that "for the purpose of applying Coast Guard vessel inspection regulations to the MARGUERITE MILLER," plaintiff was a passenger, since he was a person transported on the vessel other than as the master, a crew member, or a representative of the owner (46 USC § 2101 [21] [A] [i], [ii], [iii]). According to Blume, although the inspection regulations applicable to the Marguerite do not specifically require a gangway or other means to board or disembark a vessel, providing appropriate means of boarding and disembarking safely "is a general good marine practice," and it was the responsibility of the Marguerite's operator to ensure passengers could board and disembark safely. Blume asserted that the captain and Miller's violated their maritime duty by failing to assess the risk and provide plaintiff any means of access. He further opined that defendant breached its duty to plaintiff to equip the Marguerite with, or make arrangement for, a gangway or other suitable means for boarding and disembarking from the vessel, and that as a result, it was not fit and safe to convey passengers.

The motion court granted defendant's motion and dismissed the complaint (48 Misc 3d 1217[A], 2014 NY Slip Op 51943[U] [2014]).* Specifically, the motion court held that, because plaintiff was a harbor worker asserting a claim against a vessel owner pursuant to the LHWCA, defendant only owed him limited duties pursuant to *Scindia Steam Nav. Co. v De los Santos* (451 US 156 [1981]). Those duties were limited to turning over the vessel in a reasonably safe condition (turnover duty), conducting operations still under its control reasonably safely (active control duty), and intervening if it had knowledge of an unsafe condition under the stevedore's control (duty to intervene). Under that standard, the court held that, although the turnover duty includes providing a safe means of accessing the vessel, a vessel owner is not liable for an obvious hazard, such as the distance between the dock and deck here. The court also held that the active control duty was inapplicable because the vessel was not involved in choosing the docking location, the methods and operations of the unloading and loading process, or in plaintiff's disembarkation and reboarding. Lastly, the court held that the duty to intervene was inapplicable because the record contained no evidence that the captain was aware that Weeks did not provide a gangway or other device, or that plaintiff was choosing to jump onto the boat. We now reverse.

Any analysis of this matter must begin by resolving the scope of defendant's duty to plaintiff, which is initially determined by plaintiff's status as a passenger or worker while aboard the vessel. If plaintiff was merely a passenger, being transported to work via time charter, then an ordinary reasonable standard of care applies (*see Kermarec v Compagnie Generale Transatlantique*, 358 US 625 [1959]). In *Kermarec* the Court concluded that it was a "settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the

---

* Plaintiff perfected an appeal from that order, which this Court dismissed, finding that since, prior to the motion being decided, plaintiff's wife, who was then a plaintiff, had died and no substitution had been effectuated, the order was void (135 AD3d 655 [2016]). Thereafter, by order to show cause, plaintiff moved for an order determining defendant's prior motion in accordance with the prior ruling but with appropriate modification based on the discontinuance of the wife's derivative claim. The motion included a stipulation of discontinuance of the loss of consortium claim, executed by plaintiff as the executor of his wife's estate. By order entered June 2, 2016, the motion court granted plaintiff's motion to the extent of granting defendant summary judgment dismissing plaintiff's claim.

crew" (*id.* at 630). Furthermore, a vessel owes a duty of safe ingress and egress to its passengers (*see e.g. Raab v Laboz*, 226 AD2d 692 [2d Dept 1996]; *Schwartz v B&D Modeling & Restoration, Inc.*, 2016 WL 4485453, 2016 US Dist LEXIS 116133 [ED NY, Mar. 31, 2016, No. 13-CV-5428 (JMA) (SIL)]).

If, however, plaintiff was engaged in work while on the vessel, then the scope of duty is defined by the Supreme Court's decision of *Scindia*, which interpreted the LHWCA. The LHWCA establishes a comprehensive federal workers' compensation program to provide harbor workers and their families with medical, disability, and survivor benefits for work-related injuries and death (*Howlett v Birkdale Shipping Co.*, 512 US 92, 96 [1994]). In addition to receiving benefits, a harbor worker covered under the LHWCA may commence an action against a vessel owner for its negligence, and the vessel owner is prohibited from recovering against the harbor worker's employer (33 USC § 905 [b]). Negligence, for which a vessel owner may be liable under the act, is to be determined in accordance with "accepted principles of tort law and the ordinary process of litigation" (*Howlett*, 512 US at 97-98 [internal quotation marks omitted]).

In *Scindia* (451 US 156 [1981]), the Supreme Court addressed the duty of care owed by a shipowner to a longshoreman injured in the course of stevedoring operations aboard a ship. The Court held that the ship's liability for due care under the circumstances is limited to turning over the vessel in a reasonably safe condition (the turnover duty); conducting reasonably safe operations regarding the vessel and stevedoring operations in which it actively involves itself (the active control duty); and intervening in areas under the stevedore employer's control only if the vessel has actual knowledge of an unsafe condition that the stevedore is not exercising reasonable care to protect against (duty to intervene) (*id.* at 167-178; *see also Howlett*, 512 US at 98; *Gravatt v City of New York*, 226 F3d 108, 120-121 [2d Cir 2000], *cert denied sub nom. Gravatt v Simpson & Brown, Inc.*, 532 US 957 [2001]).

Application of *Scindia* is not limited to the stevedoring context, but "clearly applies to any independent contractor and its harborworker employees covered by the LHWCA and working aboard ship" (*Hudson v Schlumberger Tech. Corp.*, 452 Fed Appx 528, 532 [5th Cir 2011]; *see also Emanuel v Sheridan Transp. Corp.*, 10 AD3d 46 [1st Dept 2004] [*Scindia* applied to rigger]; *McConville v Reinauer Transp. Cos., L.P.*, 16 AD3d 387

[2d Dept 2005] [*Scindia* applied to worker involved in dock construction injured by ship's affixed crane]).

■ Here, plaintiff was not a mere passenger, but was working aboard the Marguerite at the time of the accident. The boat owner's liability is therefore limited to the duties outlined in *Scindia*. At the time of his accident, plaintiff was on the clock, charged with the responsibility of accompanying used Weeks port-a-johns on their journey from the bridge to the yard via the Marguerite. Indeed, at his deposition, when asked what was the purpose of the trip, he responded, "I know it was to bring stuff there and I think I had to pick up stuff to bring back" (*Chesapeake & Ohio R. Co. v Schwalb*, 493 US 40, 47 [1989] ["Coverage is not limited to employees who . . . physically handle the cargo. . . . (An employee, in this case a maintenance worker repairing a) piece of loading equipment, is just as vital to and an integral part of the loading process as the operator of the equipment"]; *see also Gravatt*, 226 F3d 108).

■ We find that there are issues of fact as to whether defendant violated both the turnover duty and the duty to intervene. First, the turnover duty has two discrete duties— the duty of safe condition and the duty to warn (*Scheuring v Traylor Bros., Inc.*, 476 F3d 781, 789 [9th Cir 2007]). The first of the turnover duties requires a vessel owner to

> "exercise ordinary care under the circumstances to turn over the ship and its equipment and appliances in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care to carry on cargo operations with reasonable safety to persons and property" (*Howlett*, 512 US at 98 [internal quotation marks omitted]; *accord Scindia*, 451 US at 166-167; *Emanuel*, 10 AD3d at 53).

"[T]he turnover duty, at a minimum, requires a vessel to provide a safe means of access" (*Scheuring*, 476 F3d at 790, citing *Gay v Barge 266*, 915 F2d 1007, 1012 [5th Cir 1990]; *Davis v Partenreederei M.S. Normannia*, 657 F2d 1048, 1053 [9th Cir 1981] [holding that the vessel owner had a responsibility to correct the positioning of the gangway]; *Casey v Commerce Constr. Corp.*, 2010 WL 2761102, \*7, 2010 US Dist LEXIS 68997, \*23-24 [D NJ, July 8, 2010, No. 08-955 (JBS/JS)] [questions as to whether vessel owner breached turnover duty where the walkways to its barges did not have handrails]).

The second of the turnover duties—or corollary to the turn-over duty—is a duty to warn of latent hazards on the ship or with respect to its equipment that are known, or with the exercise of reasonable care should be known, to the vessel owner and are likely to be encountered by, but not obvious to or anticipated by, the stevedore in the reasonably competent performance of his work (*Howlett*, 512 US at 98-100).

Here, the motion court concluded that because the hazard was open and obvious, defendant could not be liable for violating the turnover duty, citing *Kirksey v Tonghai Mar.* (535 F3d 388, 393-397 [5th Cir 2008] [where defects in the stow, which may have shifted during voyage or been improperly stowed, are open and obvious, no duty to correct the unsafe condition]), *Morehead v Atkinson-Kiewit, J/V* (97 F3d 603, 614 [1st Cir 1996] [hatch left open by coworker was an obvious condition], *cert denied* 520 US 1117 [1997]), and *Kirsch v Plovidba* (971 F2d 1026, 1027 [3d Cir 1992] [oil slick in cargo hatch was open and obvious condition]). Indeed, the dissent cites to *Kirksey* and *Kirsch* for its position that the absence of a gangway and the distance from the bulkhead to the deck were both noticeable hazards that were open and obvious. These cases, however are not dispositive of this appeal. As noted above, the turnover duty requires a vessel to provide a safe means of access to the ship (*Scheuring*, 476 F3d at 790).

Moreover, "the obviousness of the defect does not absolve the vessel owner of its duty to turn over the ship in a condition under which expert and experience[d] stevedores can operate safely" (*Martinez v Korea Shipping Corp., Ltd.*, 903 F2d 606, 610 [9th Cir 1990]). As explained by the Fifth Circuit, such a defense cannot be absolute since, "when faced with an openly dangerous shipboard condition, the longshoreman's 'only alternatives would be to leave his job or face trouble for delaying the work'" (*Stass v American Commercial Lines, Inc.*, 720 F2d 879, 882 [5th Cir 1983], quoting *Napoli v [Transpacific Carriers Corp. & Universal Cargo Carriers, Inc.] Hellenic Lines, Ltd.*, 536 F2d 505, 509 [2d Cir 1976], cited in *Scindia*, 451 US at 176 n 22). Here, there are issues of fact as to whether plaintiff really had the option of obtaining a gangway or insisting that one be provided. As noted above, he testified that jumping "was the way you got on and off the boat. They never gave you any means to get on and off the boat anywhere that you were at." Furthermore, a captain must provide a safe access to his ship, and Captain Plage had been to the Greenville facility

before, knew the condition of the bulkhead, and acknowledged that he sometimes carried ladders to help passengers board. Thus, the fact that the Marguerite was not designed to carry a gangway suitable for all docks is of no moment; there were other methods of safely boarding his boat.

In any event, *Morehead*, *Kirsch* and *Kirksey* are factually distinguishable. In *Kirksey*, the defect was to the cargo, not the ship. And in *Morehead* and *Kirsch*, the conditions complained of were transient in nature and not attributable directly to the owner or the vessel.

Accordingly, under *Scindia*, questions of fact exist as to whether defendant breached its turnover duty. It is for a jury to determine whether Miller's stated policy of not providing a gangway, and instead leaving it up to its passengers to decide whether embarkation was safe, breached that duty (*Howlett*, 512 US at 98, citing, inter alia, *Scindia*, 451 US at 167; *see also Scheuring*, 476 F3d 781).

■ There are also issues of fact as to whether defendant violated its duty to intervene. The duty to intervene requires the vessel owner to intervene in areas under the principal control of the stevedore if the owner has actual knowledge that a condition of the vessel or its equipment poses a risk of harm and the stevedore or other contractor is not exercising reasonable care to protect its employees from that risk (*O'Hara v Weeks Mar., Inc.*, 294 F3d 55, 65 [2d Cir 2002]; *Emanuel*, 10 AD3d at 53; *Gravatt*, 226 F3d at 121). Plaintiff here contends that the dangerous condition was that the vessel docked four feet below the bulkhead, a situation that made it unsafe for plaintiff to embark without assistance. Plaintiff points to Captain Plage's testimony that a height differential of 40 inches was, in his opinion, dangerous, and that he would not let a passenger "hop" down onto the deck.

Although Captain Plage was in the wheelhouse and did not see plaintiff embark the vessel, and there is no evidence that Plage knew what plaintiff intended to do (facts relied on by the dissent), he was aware of the dangerous distance between the pier and the deck of the vessel at the time of the accident, and he knew that plaintiff would have to disembark and eventually reboard (*see Scheuring*, 476 F3d at 790 n 7, citing *Gay*, 915 F2d at 1012 ["The vessel owner has a duty to intervene in the stevedore's operations when he has actual knowledge both of a hazardous condition *and* that the stevedore, in the exercise of 'obviously improvident' judgment, intends to continue work in

spite of that condition"]). Moreover, plaintiff testified at his deposition that in the previous 12 times or so that he had reboarded the Marguerite at the Greenville facility he jumped down to the boat on his own. Thus, Plage should have known that plaintiff boarded the Marguerite by jumping.

Whether there are issues of fact as to a breach of the duty of active control poses a more difficult question. The duty of active control is implicated when the vessel owner is actively involved in the harbor worker's operations (*see Emanuel v Sheridan Transp. Corp.*, 10 AD3d 46, 53 [1st Dept 2004]). To be sure, there is no evidence that Plage was in control of the activity engaged in at the time of the accident (i.e., the intended offloading of the port-a-johns). But,

> "even where the vessel does not actively involve itself in the stevedoring operations, it may be liable 'if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation' " (*Gravatt*, 226 F3d at 121, quoting *Scindia*, 451 US at 167 [emphasis omitted]).

Although an argument can be made that a captain of a vessel should always be actively involved in the boarding and disembarking of his ship, this Court need not decide this issue inasmuch as it is precluding summary judgment for the reasons stated above.

Accordingly, the order of the Supreme Court, New York County (Lucy Billings, J.), entered June 2, 2016, which to the extent appealed from as limited by the briefs, granted defendant's motion for summary judgment dismissing the complaint, should be reversed, on the law, without costs, and the motion denied.

ANDRIAS, J. (dissenting). Plaintiff, a surveyor employed by nonparty Weeks Marine, was assigned to a "fendering" project at the Spuyten Duyvil Bridge. Weeks Marine chartered a 42-foot launch boat from defendant, manned with a captain, to transport workers and equipment. In the course of transporting two port-a-johns from the bridge to Weeks Marine's Greenville yard, where they were to be swapped for new ones, plaintiff injured his leg when he attempted to board the boat by jumping from a bulkhead at the yard onto the deck below, a distance of approximately four feet, rather than calling for a

gangway or ladder that was readily available from his employer.

We all agree that plaintiff's negligence claim is governed by section 905 (b) of the Longshore and Harbor Workers' Compensation Act (LHWCA) (33 USC § 901 *et seq.*) and turns on whether defendant breached a duty under *Scindia Steam Nav. Co. v De los Santos* (451 US 156, 166-167 [1981]). In reversing the grant of summary judgment in defendant's favor dismissing the complaint, the majority finds that issues of fact exist as to whether defendant breached its "turnover duty" or "duty to intervene." However,

> "a shipowner can, ordinarily, reasonably rely on the stevedore (and its longshore employees) to notice obvious hazards and to take steps consistent with its expertise to avoid those hazards where practical to do so. . . . Thus, where a danger is obvious but easily avoidable, the shipowner will not be liable for negligence" (*Kirsch v Plovidba*, 971 F2d 1026, 1030 [3d Cir 1992]; *see also Tsaropoulos v State of New York*, 9 AD3d 1, 10-11 [1st Dept 2004]).

Here, even if defendant's failure to provide a gangway could possibly be considered as a defective or hazardous condition, it was still not a hazard that was "not known by the [plaintiff] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work" (*Scindia*, 451 US at 167). Plaintiff was not a mere passenger. He was in charge of the return of the port-a-johns to his employer's facility and told the captain where to dock. The record establishes that there was a ladder or gangway at the Weeks Marine yard and that there were no exigent circumstances that required plaintiff to jump the four feet from the bulkhead to the deck. Furthermore, as to the duty to intervene, the boat's captain did not see plaintiff jump and was not involved in plaintiff's decision to do so. Therefore, I respectfully dissent.

The turnover duty requires the owner to exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety" (*Scindia*, 451 US at 166-167). Additionally, the owner has a duty to warn the stevedore of latent or hidden dangers which are known or should have been known to the owner (*id.*). However, an owner has not breached its duty to turn over a safe vessel if the defect

that causes injury is open and obvious and one that the stevedore should have seen (*see Kirksey v Tonghai Mar.*, 535 F3d 388, 395 [5th Cir 2008]), unless the stevedore's "only alternatives when facing an open and obvious hazard are unduly impracticable or time-consuming" (*Pimental v LTD Can. Pac. Bul*, 965 F2d 13, 16 [5th Cir 1992]).

According to plaintiff's deposition testimony, although the height differential between the bulkhead and the deck could be between two and five feet, depending on when one got there, plaintiff never asked the boat's captain to provide him with a ladder, gangway or any other form of aid. Plaintiff also acknowledged that ladders and gangways were available at the yard if he wanted them, that he never asked for either, and that prior to the accident he had disembarked and boarded the boat at the same location in the yard "[m]aybe a dozen times" without incident.

Plaintiff explained that he would disembark by climbing over the bulkhead and that when he had to reboard he would "jump down." When asked if he thought that was a safe way to board, he replied: "I didn't think there was anything so wrong with it, that was common," and that just about every Weeks Marine worker did it.

Plaintiff further testified that on the date of the accident, the height differential between the bulkhead and the deck was "[a]bout four feet," which was not unusual. In accordance with his customary practice, plaintiff climbed up on the bulkhead, face forward, and informed a coworker that he was there and what needed to be done. The pair walked back to the boat together and the coworker boarded first by jumping down. Plaintiff did not ask anyone at Weeks Marine for a gangway or ladder and decided to ask the coworker to stand there for a second so he could put his hand on his shoulder as an anchor and jump down. Plaintiff did not see the boat's captain, who "had no involvement in [his] decision to reboard or jump on the boat."

Plaintiff leaned forward with his left arm to reach his coworker's shoulder, then jumped. He had never tried to use a coworker to hold onto while he jumped before. When plaintiff landed, his leg "blew out." Plaintiff laid on his back "until [a Weeks Marine employee] got a gangway out and an ambulance showed up." If the coworker had not been there, plaintiff would have turned around and climbed down from the bulkhead.

The coworker stated in an affidavit that he had asked a supervisor for a gangway, but decided not to wait for it to board

the boat because they "had a lot of work to do that morning." After he boarded, he saw plaintiff falling towards him, and tried to hold him up. He did not know why plaintiff attempted to board the boat or why he lost his balance.

The boat's captain testified that the location and timing of his trips were decided by Weeks Marine employees. When they approached the Greenville yard, plaintiff would call the facility by cell phone to determine where they should dock. The captain remained in the boat's wheelhouse, monitoring the marine radio and waiting for instructions, and did not see plaintiff disembark or attempt to board the boat. Generally, the boat, which did not have its own gangway, portable stairs or ladder on board, matched up pretty well to the heights of Weeks Marine's barges.

Defendant's vice-president of operations testified that the company's policy is to use the gangway provided by the facility where the boat is docking. The boat could not carry its own gangway because vessels of that size do not have the room to carry one long enough for all situations. Defendant's stated policy is that the person disembarking is the one who decides whether it is safe to get on or off the boat. As long as there is ample water under the hull and nothing in the waterway that could harm the vessel, the boat will dock where the client directs.

On this record, defendant did not violate its *Scindia* turn-over duty. The failure to provide a gangway was open and obvious when Weeks Marine chartered the vessel, and the record reveals no evidence that plaintiff's means to reboard the vessel was limited to jumping down onto the deck or that requesting a safer alternative to board would have been unduly impractical or time-consuming. As the motion court found, plaintiff does not present any evidence that the distance between the pier and the deck was a condition that an experienced stevedore would not expect to encounter or that such condition would prevent the stevedore from carrying out its cargo operations with reasonable safety. Accordingly, defendant was entitled to rely on plaintiff's experience working at his employer's facility, his familiarity with the conditions there and the process of boarding from a pier to the vessel.

The majority disagrees, holding that issues of fact exist as to whether defendant's stated policy of not providing a gangway or other device to permit safe disembarkation from its vessel, and leaving it up to its passengers to decide whether embarka-

tion was safe, violated its turnover duty. Stating that the turnover duty at a minimum requires a vessel to provide a safe means of access and that the obviousness of the defect does not absolve the owner of its duty to turn over the vessel in a condition under which an experienced stevedore can operate, the majority finds that there are issues of fact as to whether plaintiff really had the option of obtaining a gangway or insisting that one be provided.

However, unlike the cases cited by the majority, such as *Scheuring v Traylor Bros., Inc.* (476 F3d 781 [9th Cir 2007]) and *Gay v Barge 266* (915 F2d 1007 [5th Cir 1990]), which dealt with injuries caused by defective ramps or gangways, we are dealing with the failure to provide a gangway. "There is no duty to turn over an absolutely safe vessel" (*Sinagra v Atlantic Ocean Shipping, Ltd.*, 182 F Supp 2d 294, 300 [ED NY 2001]), and the failure to provide a gangway is not negligence per se. Defendant's vice-president of operations testified that the boat was not designed to carry a gangway suitable for all docks at all Weeks Marine facilities and plaintiff's expert acknowledged that the inspection regulations applicable to the boat did not specifically require a gangway or other means to board or disembark from the vessel. Furthermore, the absence of a gangway or other device for boarding or disembarking and the distance of approximately four feet between the bulkhead and the deck of the boat were immediately noticeable and any hazard posed thereby was an open and obvious condition. Plaintiff did not present any evidence that the condition was one that an experienced stevedore would not expect to encounter or that the condition would prevent the stevedore from carrying out its cargo operations with reasonable safety. Nor did plaintiff produce any evidence that requesting a safer alternative to board would have been unduly impractical or time-consuming.

Indeed, plaintiff admits that on prior occasions he had boarded the boat at the same location by jumping down from the bulkhead, that he never requested any form of assistance from any source to board the boat, even though he was aware that Weeks Marine kept gangways or ladders available for his use at its facility where the boat docked, and that he had no intention to make such a request. Significantly, plaintiff was not faced with exigent circumstances that required him to jump from the bulkhead to the deck, and he acknowledges that he did not notify the captain when he was reboarding and that he decided to jump down to the deck only because he believed he could lean on the worker in front of him for support.

Nor is there an issue of fact as to whether defendant breached its duty to intervene.

> "The duty to intervene is an exception to the generally limited duties imposed on the vessel once operations have begun. Under the duty to intervene, the vessel owner must intervene if it acquires actual knowledge that (1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) the stevedore is not exercising reasonable car[e] to protect its employees from that risk" (*Giganti v Polsteam Shipping Co.*, 588 Fed Appx 74, 75 [2d Cir 2015] [internal quotation marks and citation omitted]; *Emanuel v Sheridan Transp. Corp.*, 10 AD3d 46, 53 [1st Dept 2004]).

If the owner knows of a potentially dangerous condition, but "reasonably believe[s] . . . that the stevedore will act to avoid the dangerous condition[ ], the owner cannot be said to have been negligent, for the decision whether a condition imposes an unreasonable risk of harm to longshoremen is 'a matter of judgment committed to the stevedore in the first instance' " (*Hodges v Evisea Mar. Co., S.A.*, 801 F2d 678, 687 [4th Cir 1986], *cert denied* 480 US 933 [1987], quoting *Scindia*, 451 US at 175). Thus, the danger posed by the absence of a gangway being open and obvious, defendant was entitled to rely on Weeks Marine's judgment as to whether its operations could safely be undertaken, unless its "judgment in proceeding under the circumstances was 'obviously improvident' " (*Bonds v Mortensen & Lange*, 717 F2d 123, 128 [4th Cir 1983], quoting *Scindia*, 451 US at 175).

The majority finds that there are issues of fact as to whether defendant breached its duty to intervene because the captain was aware of the dangerous distance between the pier and the deck, and that plaintiff would have to disembark and eventually reboard at some point. The majority further finds that because plaintiff testified that he had reboarded by jumping on 12 or so prior occasions, the captain should have been aware of the dangerous method of accessing the boat.

However, as the majority acknowledges, the captain did not see plaintiff embark. There is no evidence that he had actual knowledge of what plaintiff intended to do and " 'should-have-known' constructive knowledge is insufficient to meet the actual knowledge requirement" (*Gravatt v City of New York*, 226 F3d 108, 127 n 17 [2d Cir 2000], *cert denied sub nom. Gravatt v*

*Simpson & Brown, Inc.*, 532 US 957 [2001]). In any event, the majority's theory is speculative (*see Park v Kovachevich*, 116 AD3d 182, 191, 192 [1st Dept 2014], *lv denied* 23 NY3d 906 [2014]). While a gangway and ladders were available at the Weeks Marine yard, plaintiff did not ask for one and decided to put his hand on a coworker's shoulder and jump down, a method he had not used before. Indeed, plaintiff testified that if his coworker had not been there, he would have turned around and climbed down from the bulkhead. Furthermore, even if Weeks Marine's employees regularly boarded by jumping, there is no evidence that the captain ever observed them jumping from a distance of four feet. Nor is there any proof that proceeding with Weeks Marine's operations under the circumstances was "obviously improvident" (*Scindia*, 451 US at 175).

Accordingly, the order granting defendant summary judgment should be affirmed.

MAZZARELLI, FEINMAN and WEBBER, JJ., concur with ACOSTA, J.P.; ANDRIAS, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered June 2, 2016, reversed, on the law, without costs, and the motion denied.